IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF VIRGINIA

Newport News Division


KEN SPIRITO,

     PLAINTIFF,

V.                              CASE NO.:  4:18cv58

LISA M. ORTIZ,

E. RENEE FORD,

WILMER K. THOMAS, JR.

SHARON P. SCOTT,

PENINSULA AIRPORT COMMISSION
NEWPORT NEWS/WILLIAMSBURG INTERNATIONAL AIRPORT,

AND

THE DAILY PRESS, INC.

SERVE:     THE DAILY PRESS, INC.
             100 SHOCKOE SLIP, 2nd FLOOR
             RICHMOND, VIRGINIA   23219

           DEFENDANTS.


## COMPLAINT

NOW COMES Plaintiff, Ken Spirito ("Plaintiff"), by counsel, and moves this Court

for judgment against Defendants Lisa M. Ortiz ("Ortiz"), E. Renee Ford ("Ford"), Wilmer

K. Thomas, Jr. ("Thomas"), Sharon P. Scott ("Scott"), the Peninsula Airport Commission

("PAC"), and The Daily Press, Inc. ("The Daily Press"). In support thereof, Plaintiff states as follows.

## NATURE OF THE CASE

1.      This is an action for defamation against The Daily Press, the PAC, and four individuals acting within the scope of their employment and/or agency with the PAC with respect to the events described herein.

2.      The defamation by all Defendants includes defamatory statements by implication about the "shredding" of evidence related to a Virginia Department of Transportation ("VDOT") investigation of the People Express operation at the Peninsula airport. The defamation described herein appears to have originated with text messages exchanged between PAC employees and commissioners.

3.      Although emails and other documents show that Plaintiff attempted to protect the PAC from losses related to the People Express operation more diligently than any other individual involved, The Daily Press targeted Plaintiff and commenced a relentless defamatory campaign against him, publishing false allegations about financial misconduct and shredding of evidence, and splashing these false allegations across the front page of its publication. The front page of the June 3, 2017 edition of the paper included a large graphic covering approximately two-thirds of the front page showing an image of evidentiary materials overlaid with pictures of text messages displaying the allegations of "shredding" by Plaintiff. The actions of all Defendants in publishing these false and defamatory statements were wantonly reckless.

4.     The defamation described herein has caused predictable, catastrophic damage to Plaintiff in his business, trade, profession, occupation, and reputation.

## THE PARTIES

5.     Plaintiff is a natural person and a citizen of Maryland.  During the events pertinent to this matter, Plaintiff resided in Williamsburg, Virginia and served as the Executive Director of the PAC.  As Executive Director, Plaintiff was responsible for the day to day management of the airport.

6.     The PAC is a privately-funded body created by an Act of the General Assembly in 1946. The PAC generates revenue from fees and charges from its users (airlines, general aviation, land leases, rental cars, parking, etc.) at the airport facility located in Newport News, Virginia.  All major decisions regarding the governance of the airport, including decisions relating to investments of capital and contracting with airlines, are made by a vote of its board of commissioners.

7.     Ortiz is an Accounting Specialist employed by the PAC. Ortiz initiated one or more of the text messages stating that Plaintiff was shredding documents, intentionally conveying the false implication that he was shredding evidence related to the People Express investigation.

8.     Ford is the Director of Finance and Administration for the PAC.  During the time that Plaintiff served as the Executive Director, Ford reported to Plaintiff and was evaluated by him.  Ford received and responded to one of the text messages stating that Plaintiff was shredding documents and added her own comments, intentionally conveying

the false implication that Plaintiff was shredding evidence related to the People Express investigation.

9.      Thomas was a custodian employed by the PAC.  Thomas initiated one or more of the text messages stating that Plaintiff was shredding documents, intentionally conveying the false implication that Plaintiff was shredding evidence related to the People Express investigation.

10.     Scott was, and is, a Board Member of the PAC and is a member of the City Council of the City of Newport News. Scott received one of the text messages stating that Plaintiff was shredding documents.  Acting in her capacity as a Board Member and as an agent of the PAC, Scott conveyed the message to others with the intention of conveying the false implication that Plaintiff was shredding evidence related to the People Express investigation.

11.     The Daily Press is a Virginia print newspaper that also publishes online. Its primary publishing footprint encompasses the Hampton, Newport News, and Williamsburg areas, and its online published materials are available worldwide.

## JURISDICTION AND VENUE

12.     This court has diversity jurisdiction over this matter pursuant to U.S. Code Section 1332(a) because Plaintiff is a citizen of Maryland and Defendants reside or are headquartered in the Commonwealth of Virginia. The individual Defendants reside in Virginia. Defendant, The Daily Press, Inc., is headquartered in Newport News, Virginia and, upon information and belief, is incorporated in the State of Delaware. The PAC is a Virginia entity created by an Act of Assembly of the Commonwealth of Virginia. Plaintiff

claims catastrophic damages in this action related to his trade, profession and reputation including significant permanent lost earnings, and the amount in controversy in this matter accordingly exceeds $75,000.

13.     Venue properly lies in this Court because the acts of defamation described herein were committed in substantial part within the Eastern District of Virginia, the cause of action arose in substantial part within the Eastern District of Virginia, and the Defendants reside or conduct substantial business within the Eastern District of Virginia.

## **FACTUAL BACKGROUND**

14.     Plaintiff devoted his career to the profession of airport management.  He received Accredited Airport Executive status in September, 1997. Receiving this distinguished designation at the age of 25, he was the youngest airport professional to do so in the United States. Until the occurrence of the defamatory events described herein, Plaintiff was extraordinarily well regarded in the airport management profession, was recognized in distinguished leadership positions within the profession, and was actively recruited by airports across the country for executive management positions.

15.     Plaintiff began his employment as Executive Director of the PAC in January, 2009 and served in that capacity until his termination following the defamatory events described herein.

16.     Due to the loss of one of its primary airlines, beginning in 2011 the PAC explored options for securing a low-fare airline to establish low-fare commercial air service to the destinations it historically supported.

17.     In 2014, the PAC Board of Commissioners voted to approve a contractual arrangement with People Express and voted to guarantee a loan to People Express in an effort to facilitate its operation at the airport.   People Express operated briefly, but quickly failed and defaulted on the loan. In 2017 the events were investigated by VDOT.

18.     Emails and other documents conclusively show that Plaintiff attempted to protect the PAC from losses related to the People Express operation more diligently than any other individual involved. In emails exchanged before the People Express contract was finalized, Plaintiff urged the PAC Board of Commissioners and its legal counsel to include certain protections in the contract, such as a requirement of express authorization by the PAC of disbursement of funds to People Express. The PAC disregarded some of these vital protective measures and they were not included in the contract despite Plaintiff's recommendations.

19.     As the shortcomings and failures of People Express to meet its obligations became apparent in the early days of its operation at the airport, Plaintiff repeatedly alerted the PAC to the problems and the potential for financial losses.  Plaintiff ultimately drew the ire of the People Express executives for being instrumental in cutting off the flow of funds to People Express.

20.     Despite these facts; however, the reporting in The Daily Press was telling a different story; instead targeting Plaintiff as being to blame for the failure of People Express and the loan default.  As the investigation unfolded in early 2017 and the targeting of Plaintiff became widely known, certain disgruntled PAC employees began a digital whispering campaign of unfounded innuendo that Plaintiff was shredding documentary evidence relevant to the People Express investigation.

21.     On the evening of January 27, 2017, Thomas entered Plaintiff's office to remove trash from the office.  Also present in Plaintiff's office at that time was Jessica Wharton. Thomas initiated a conversation in which he was complimentary toward Plaintiff and Wharton regarding the overall management of the airport, protection of the employees, and integrity of operating the airport.  Plaintiff did not shred any documents on that date.

22.     On February 14, 2017, Thomas was terminated from his employment by Melissa Cheney for making inappropriate comments to an airline employee.

23.     On April 12, 2017, following his termination for cause, Thomas sent the following text message to Sharon P. Scott:

> *"I told you I know about that I know about the paper shedding a couple of weeks ago. I saw Jessica and Ken coming from the shredder when I walked in the office after 8pm. Then I was let go about two weeks later… "*

On an earlier, unknown date, Thomas wrote the following text message to Sharon P. Scott:

> *"I know about the paper shredding at the airport! … "*

24.     Both the allegation that Plaintiff was shredding anything at that time and the implication that he was shredding something improperly were complete fabrications. Thomas was a disgruntled former employee at the time that he sent the April 12th messages and may have been an employee of the PAC at the time that he sent the earlier message related to shredding.

25.     On March 2, 2017, Plaintiff shredded hard copies of some old, duplicate airline presentations as part of his routine duties. Upon information and belief, the presentations remained in existence in hard copy and electronic form in Plaintiff's office

in his bookcase and on his computer, and possibly on the main PAC servers as well, after the duplicate hard copies were shredded. There was absolutely nothing improper about shredding these documents and nothing in connection with the People Express investigation was shredded.

26.     On March 2, 2017, while shredding hard copies of old, duplicate airline presentations unrelated to any investigation, Plaintiff was accompanied by his assistant, who was an eyewitness to the shredding in question. This witness is expected to testify that Plaintiff was shredding old, duplicate copies of airline presentations unrelated to any investigation, that nothing of an evidentiary nature or related to an investigation was shredded on that occasion and that there was nothing out of the ordinary about Plaintiff's shredding documents on that occasion.

27.     On March 2, 2017, the following text message exchange occurred between Ortiz and Ford:

>  Ortiz: *"Wow Ken is shredding shredding shredding."*
>
>  Ford: *"Unbelievable"*
>
>  Ortiz: *"Seems kinda weird"*
>
>  Ford: *"This is getting out of hand!"*

The obvious implication that Plaintiff was shredding something improperly was false.

28.     The text messages and the preposterous innuendo regarding destruction of evidence were further published and transmitted to others, ultimately finding their way into the VDOT report relating to the People Express investigation and to the front page of The Daily Press.

29.     Upon information and belief, Thomas and/or Scott further published Thomas' remarks in the text messages to VDOT or to others.

30.     Upon information and belief, Ford further published her remarks in the text messages to VDOT and to others, including PAC commissioners Steve Mallon and Rob Coleman.

31.     Upon information and belief, Lisa M. Ortiz further published her remarks in the text messages to VDOT or to others.

32.     Upon information and belief, Scott further published her remarks in the text messages to VDOT or to others.

33.     Any allegation, by implication or otherwise, that Plaintiff was destroying documents for an improper purpose is utterly false.  Shredding unneeded documents was a routine part of the duties for most of the employees at the PAC office, including Plaintiff.

34.     On the day in question on which Plaintiff acknowledges shredding documents.

35.     The PAC office had a shredder for the use of PAC personnel since before the time that Plaintiff arrived at the facility in January, 2009.

36.     At Plaintiff's direction, the shredder was moved from an enclosed room out into the open space of the office near the printer where numerous employees were normally present and able to observe anyone shredding documents. A diagram of the office showing the location of the shredder where it had been moved in early 2009, at Plaintiff's direction, is attached hereto as Exhibit "A."

37.     While there was no written policy, all PAC employees working at the office were aware of the unwritten policy that sensitive documents, including such things as

personnel records, financial information, and proprietary business information, should be shredded for privacy and security purposes.

38.     All employees working at the PAC office, specifically including Ortiz and Ford, were aware that the same policy was followed by Plaintiff.

39.     It was known and understood by employees at the PAC office, specifically including Ortiz and Ford, long before the exchange of text messages set forth above, that Plaintiff, as executive director of the airport, often handled sensitive information and would need to personally shred documents from time to time. Such documents would include personnel information and evaluations used during employee evaluation conferences, other sensitive personal information such as Social Security numbers, credit card numbers and the like, proprietary business information not to be disclosed to competing entities and other such information. In many cases it would not be appropriate or acceptable for the Executive Director to simply hand these documents to another employee to be taken to the shredder and shredded, precisely for the reason that the information is sensitive and not to be disclosed to others. The Executive Director would not, for example, hand one employee's salary information or personnel evaluations to another employee to be shredded. Such a practice would obviously contradict the reasonable security required to maintain the confidentiality of the information. All of this was well known generally to employees at the PAC office, including, specifically, Ortiz and Ford.

40.     It was also known to PAC Commissioners, including specifically Rob Coleman, Steve Mallon and Sharon P. Scott, that Plaintiff routinely shredded documents himself because at the conclusion of closed door PAC meetings in which sensitive

documents were discussed and referenced, various Commissioners would request that sensitive documents be destroyed and they understood that Plaintiff would do this himself to protect the security of the information.

41.     During his tenure as Executive Director, Plaintiff had, in fact, personally shredded documents regularly, approximately one to two times per week on average for approximately eight years. Each time he did this, Plaintiff was in an open area of the office with numerous PAC employees typically in the area and able to observe Plaintiff shredding documents. Plaintiff can identify several PAC employees who witnessed this and would, upon information and belief, testify to this fact under oath if asked to do so.

42.     Like other PAC employees, Plaintiff routinely shredded documents at various times of the day and there would be nothing out of the ordinary about Plaintiff shredding documents at 8:00 AM or after hours or at any other time of day.

43.     Both Ortiz and Ford had, in fact, observed Plaintiff personally shredding documents on numerous occasions prior to their exchange of the text messages set forth above.

44.     On November 9, 2016, Ford organized a PAC-wide shredding day.

45.     There was no change in the PAC's practices or policies regarding shredding of documents when the VDOT investigation began or thereafter. PAC personnel, including Plaintiff, continued to shred documents routinely as needed while the investigation was ongoing. This fact was also known to employees at the PAC office, including, specifically, Ortiz and Ford.

46.     Although Defendants Thomas and Scott did not normally work at the PAC office during business hours, both should have been aware based on personal experience

and common sense that the shredder was present in the office for the general use of all employees including the Executive Director, that the Executive Director would sometimes be required to personally shred documents given that he often handled sensitive and confidential information, and that the Executive Director did so on occasion. Upon information and belief, both Thomas and Scott were aware of these facts.

47.     The clear and unavoidable implication of the statements in the text messages is that Plaintiff was shredding paper documents in order to destroy evidence related to the ongoing People Express investigation, or was shredding for some other improper purpose.

48.     A further implication of the statements in the text messages is the factual assertion that Plaintiff was guilty of some form of wrongdoing in the past, such that he needed to cover it up. Further still, an additional implication is that Plaintiff was dishonest enough that he would be willing to destroy evidence in order to cover up his past wrongdoings. The text messages convey clear, unavoidable factual implications that constitute defamation *per se* on multiple levels.

49.     Defendants Ortiz, Thomas, Ford, and Scott, along with others including Commissioners Rob Coleman and Steve Mallon, were part of a faction within the Peninsula airport that wished to see Plaintiff removed as Executive Director for their own reasons, not because doing so would be good for the PAC.  Ford specifically had reason to wish that Plaintiff was removed from his position because she was supervised and rated by Plaintiff, had received poor evaluations from him due to consistently poor performance, and knew that she was close to being terminated from her position if Plaintiff continued as the Executive Director. Thomas was a disgruntled employee. Commissioner

Mallon was friends with Tom McDermott who had been engaged in a longstanding feud with Plaintiff relating to the operation of the airport restaurant.  These individuals acted in whole or in part out of ill-will and malice toward Plaintiff in publishing the implied allegations of improper shredding of documents, despite their knowledge that these implied allegations were false, or, at a minimum, their high degree of certainty that they were false.

50.    There would be no conceivable reason for the declarants to make the said statements but for their desire to raise the defamatory implications of wrongdoing.

51.    An observation that Plaintiff was using the shredder was nothing more than an observation of a routine task that Plaintiff had been performing on a weekly basis in the open, in front of numerous PAC employees, for at least eight years. There was never any reason whatsoever to infer or conclude that Plaintiff was destroying evidence in an effort to impede an investigation based on any such observation.  In fact, Lisa Ortiz, the initiator of one of the defamatory text messages, has contacted Plaintiff and apologized for making the statements because she had no grounds to make them.

52.    Furthermore, at the time of the shredding occurring on March 2, 2017, Plaintiff was accompanied by his assistant, who is expected to corroborate the fact that Plaintiff was shredding unrelated materials and that there was nothing out of the ordinary about shredding at the time and date in question. Upon information and belief, Plaintiff's assistant would have related these facts to anyone at any time had she been asked.

53.    Nevertheless, the implied report of Plaintiff shredding evidence was seized upon by The Daily Press and splashed across the front page of the June 3, 2017 edition of the paper. The story included a large graphic, covering approximately two-thirds of the

front page, showing images of evidentiary materials overlaid with pictures of text messages displaying the allegations of "shredding" by Plaintiff.  A copy of the front page of the June 3, 2017 edition of The Daily Press is attached hereto as Exhibit "B."

54.     The ultimate publication of the sensational shredding allegations in The Daily Press and ensuing further publicity on social media and elsewhere was the natural and foreseeable consequence of the initial publication of each and every statement by Ortiz, Ford, Thomas, Scott, and Coleman as set forth above.

55.     On October 8, 2017, The Daily Press published another article on the shredding.  This article republished the allegations about the shredding of documents although there was still no evidence whatsoever that Plaintiff had shredded anything improperly.

## THE DEFAMATORY STATEMENTS

A.     Defamatory statements by PAC employees and vicariously by the PAC

56.     All of the allegations in the forgoing paragraphs of this Complaint are incorporated herein by reference.

57.     All of the statements set forth in this subsection were made by PAC employees within the course and scope of their employment with the PAC, or as agents of the PAC, and these statements are imputed to the PAC.

58.     On April 12, 2017, Thomas sent the following text message to Scott:

*"I told you I know about that I now about the paper shedding a couple of weeks ago. I saw Jessica and Ken coming from the shredder when I walked in the office after 8pm. Then I was let go about two weeks later… "*

On an earlier, unknown date, Thomas wrote the following text message to Scott:

*"I know about the paper shredding at the airport! … "*

59.     These statements by Thomas were of and about Plaintiff.

60.     Both the allegations that Plaintiff was shredding anything at that time and the implication that he was shredding something improperly were false in that there was absolutely nothing improper about any shredding of documents by Plaintiff and nothing in connection with the People Express investigation was shredded.

61.     On March 2, 2017, the following text message exchange occurred between Ortiz and Ford:

> Ortiz: *"Wow Ken is shredding shredding shredding."*
>
> Ford: *"Unbelievable"*
>
> Ortiz: *"Seems kinda weird"*
>
> Ford: *"This is getting out of hand!"*

62.     These statements by Ortiz and Ford were of and about Plaintiff.

63.     On or about March 2, 2017, Ford notified Commissioners Steve Mallon and Rob Coleman that she had received the messages and conveyed the contents of the messages about shredding to them. Coleman, acting in his capacity as a Commissioner and as an agent of the PAC, made a report of the shredding allegation to the State Police. Although the exact substance of Coleman's statement to the police is unknown to Plaintiff at this time, this communication is an additional instance of defamation for which the PAC is responsible.

64.     The implied allegations that Plaintiff was shredding something improperly were false in that there was absolutely nothing improper about any shredding of documents by Plaintiff and nothing in connection with the People Express investigation was shredded.

65.     In its June 2, 2017 online edition, The Daily Press ran a story that included the following:

*By Dave Ress*       *JUNE 2, 2017*

*They reported that they had received two separate reports that former executive director Ken Spirito had shredded and destroyed documents after the auditors asked for airport records. They said they were also given information that Spirito had removed records from the airport.*

66.    In its June 3, 2017 print edition, The Daily Press ran a front-page story on the People Express controversy and VDOT's investigation. The story included a large front-page graphic comprising approximately two-thirds of the front page. The graphic featured pictures of documents that would be deemed by a reasonable person to be of evidentiary value in VDOT's investigation into the loan to People Express. Overlaid over the image of these documents were "screen shots" of the text messages set forth above. The text messages identify "Ken" as the person engaged in the shredding of documents. The accompanying story is about Plaintiff's involvement in the People Express Contract and loan to People Express.

67.    The front-page graphic of the June 2, 2017 Daily Press republished the defamatory text messages between Ortiz and Ford, and between Thomas and Scott as set forth above.

68.    The article appearing on the cover of the June 3, 2017 print edition of the Daily Press, authored by Dave Ress, also included this statement:

*The auditors blasted the commission's lack of transparency about the deal, and reported that they had received two separate reports that former airport executive director Ken Spirito had shredded and destroyed documents after they asked for records about the payment. They also received reports that he had removed documents from the airport.*

69.     The implied allegations that Plaintiff was shredding something improperly were false in that there was absolutely nothing improper about any shredding of documents by Plaintiff and nothing in connection with the People Express investigation was shredded.

70.     The implied allegations that Plaintiff was removing documents improperly were likewise false in that nothing in connection with the People Express investigation was removed by Plaintiff.

71.     A June 3, 2017 editorial in The Daily Press made the following statements:

*This goes beyond losing jobs. The next question, in light of this audit, becomes whether Spirito or anyone else needs to be brought up on charges. Whether anyone needs to go to prison.*

*Yes, it's that serious.*

72.     These statements in the June 3, 2017 editorial were of and about Plaintiff.

73.     These statements in the June 3, 2017 editorial were false in that they implied, in conjunction with the front page allegations of the same date of shredding documents, that Plaintiff committed a crime by shredding documents.

74.     When The Daily Press and its reporters obtained access to the contents of the text messages set forth above, they were presented with nothing more than an innuendo regarding the shredding of evidence. They did not have even a single witness affirmatively stating that evidentiary documents had been shredded, only a mere innuendo with no supporting factual contentions. Thus, the evidence available to the Daily Press at that time did not amount even to level of a single anonymous phone call because not even a single witness was standing behind the allegation of wrongdoing. With nothing more than this, the Daily Press and its reporters must have entertained serious doubts

about the truth of the allegation that the Plaintiff, a successful executive who was highly regarded and well respected at the time, intentionally shredded documentary evidence relating to an ongoing investigation.

75.     The lowest possible standard of journalistic practice would not have permitted the publication of the implication of the shredding of evidence by the Plaintiff under these circumstances, and yet the Daily Press published a story covering two thirds of the front page of its publication virtually shouting the allegation that the Plaintiff had shredded evidentiary documents in connection with the Virginia Department of Transportation investigation. The lowest possible standard of journalistic practice would have dictated that some effort toward substantiating the implied allegation would have been undertaken prior to the publication of such an allegation, yet no such effort was undertaken prior to the publication of the June 2, 2017 and June 3, 2017 articles.

76.     There was no urgency to report the absurd allegation of the shredding of evidentiary documents. The Daily Press and its reporters could have paused to investigate. They did not do so because they had already predetermined the narrative they wished to convey, which featured Plaintiff as the villain. The predictable consequence of the Daily Press's reporting has been an outpouring of hatred, hostility and contempt from its readers toward the Plaintiff. Comments on social media relating to Daily Press stories routinely contain words such as "liar," "criminal," and "snake" referring to the Plaintiff. The Plaintiff's standing and reputation  in the community has been shattered. The Plaintiff's family has been subject to ridicule and questioning about the Plaintiff's alleged wrongdoing. The Plaintiff's prospect of employment in his chosen profession has been similarly shattered.

## COUNT I:      DEFAMATION PER SE AGAINST ALL DEFENDANTS

77.     All of the allegations in the forgoing paragraphs of this Complaint are incorporated herein by reference.

78.     All of the defamatory statements as set forth above between Ortiz and Ford, and between Thomas and Scott and Coleman's report to the State Police as set forth above, were made maliciously, with spite and ill will toward Plaintiff. The actions of the PAC and its employees in publishing these statements constitutes common-law malice under Virginia law.

79.     All of the defamatory statements as set forth above between Ortiz and Ford, and between Thomas and Scott, and Coleman's report to the State Police were made maliciously, with knowledge of their falsity or with reckless disregard for their truth or falsity, and the actions of The PAC and its personnel constitutes *New York Times* actual malice under Virginia law and applicable federal law.

80.     All of the defamatory statements published by The Daily Press as set forth above were made maliciously, with spite and ill-will toward Plaintiff and the actions of The Daily Press and its personnel constitute common-law malice under Virginia law.

81.     All of the defamatory statements published by The Daily Press as set forth above were made maliciously, with knowledge of their falsity or with reckless disregard for their truth or falsity, and the actions of The Daily Press and its personnel constitutes *New York Times* actual malice under Virginia law and applicable federal law.

82.     Evidence of actual malice on the part of The Daily Press and its personnel includes, but is not limited to: the facial lack any factual support for the published allegations; obvious disregard for the truth or falsity of the published allegations; evidence

that Daily Press personnel doubted the truth of the allegations before publication; evidence from a subsequent telephone message from Daily Press reporter Peter Dujardin indicating that months after the first publication of the shredding allegations in The Daily Press, he still did not know anything about what was actually shredded; needlessly reporting false and overblown allegations of financial malfeasance against Plaintiff in more than 30 print articles to date. Many of these articles deal with subjects for which the financial allegations against Plaintiff are entirely irrelevant, evincing a motive of ill will toward Plaintiff in repeatedly publishing these allegations.

83.     The defamatory statements set forth herein imply that Plaintiff is not fit for his profession and imply the commission of a crime. The law presumes damages for these defamatory statements.

84.     The defamation described herein has caused catastrophic damage to Plaintiff in his business, trade, profession, occupation. Plaintiff has incurred special damages in that he can no longer pursue his career in his chosen profession. He has been forced to accept employment at a much lower income and has sustained lost earnings to date as well as permanent loss of income capacity. Special damages further include damage to reputation and standing in the community, embarrassment, humiliation, mental suffering, and incurring bills for the treatment of emotional problems directly related to these injuries.

## COUNT II:  DEFAMATION AGAINST ALL DEFENDANTS (IN THE ALTERNATIVE TO COUNT I)

85.     All of the allegations in the forgoing paragraphs of this Complaint are incorporated herein by reference.

86.     All of the defamatory statements as set forth above between Ortiz and Ford, and between Thomas and Scott, as well as the report by Commissioner Rob Coleman to the police, were made within the course and scope of their employment with the PAC, or as agents of the PAC, and the actions of these employees and agents are imputed to the PAC.

87.     All of these statements by PAC employees and agents were made negligently with disregard for their truth or falsity.

88.     All of these statements by PAC employees and agents as set forth above were made maliciously, with knowledge of their falsity or with reckless disregard for their truth or falsity, and the actions of the PAC employees and agents constitutes _New York Times_ actual malice under Virginia law and applicable federal law.

89.     All of the defamatory statements published by The Daily Press as set forth above were made maliciously, with knowledge of their falsity or with reckless disregard for their truth or falsity, and the actions of The Daily Press and its personnel constitutes _New York Times_ actual malice under Virginia law and applicable federal law.

90.     The defamatory statements published by The Daily Press as set forth above were made recklessly and negligently.

91.     The defamation described herein has caused catastrophic damage to Plaintiff in his business, trade, profession and occupation. Plaintiff has incurred special damages in that he can no longer pursue his career in his chosen profession. He has been forced to accept employment in a different field at a much lower income and has sustained lost earnings to date as well as permanent loss of income capacity. Special damages further include damage to reputation and standing in the community,

embarrassment, humiliation, mental suffering, and bills incurred for the treatment of emotional problems directly related to these injuries.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order Awarding judgment in favor of Plaintiff against Defendants, as follows:

1. **Count I — Defamation Per Se Against All Defendants** –

   a. For compensatory damages and punitive damages against Ortiz, Ford, Scott, Thomas and the PAC, jointly and severally;

   b. For compensatory damages and punitive damages against the Daily Press;

   c. Plaintiff's costs, pre-judgment and post-judgment interest at the legal rate of interest against each defendant; and such further relief as the court may deem appropriate.

2. **Count II — Defamation Against All Defendants**

   **(In the Alternative to Count I)**

   a. For compensatory damages and punitive damages against Ortiz, Ford, Scott, Thomas and the PAC, jointly and severally;

   b. For compensatory damages and punitive damages against the Daily Press;

   c. Plaintiff's costs, pre-judgment and post-judgment interest at the legal rate of interest against each defendant; and such further relief as the court may deem appropriate.

**TRIAL BY JURY IS DEMANDED**

Respectfully submitted,

**KEN SPIRITO**

By:*/s/ David L. Littel*
David L. Littel, Esq.
Virginia State Bar No. 37690
Kellam P. Parks
Virginia State Bar No.:  45735
PARKS ZEIGLER, PLLC
4768 Euclid Road, Suite 103
Virginia Beach, Virginia  23462
757-453-5053 phone direct dial
757-453-7578 facsimile
dlittel@pzlaw.com
kparks@pzlaw.com