IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

KEN SPIRITO,

        **Plaintiff,**

        **v.**                                   **Civil Action No. 4:18cv58**

PENINSULA AIRPORT COMMISSION,
etc., et al.,

        **Defendants.**

## ORDER

This matter is before the Court pursuant to six (6) Motions:

- Peninsula Airport Commission ("PAC") Defendants'[1] Motion to take Judicial Notice, Doc. 9;

- PAC Defendants' Second Motion to Take Judicial Notice, Doc. 14;

- PAC Defendants' Motions to Dismiss, Docs. 3-7[2];

- The Daily Press, LLC's ("Daily Press'" or "DP's") Motion to Dismiss, Doc. 23;

- PAC Defendants' Motion to Sever, Doc. 11; and

- DP's Motion to Sever, Doc. 25.

On November 8, 2018, the Court held a hearing on the above motions and, upon consideration of the parties' briefs and arguments in court, the Court **RULES** as outlined below.

---

[1] This refers to: Defendant Lisa M. Ortiz ("Defendant Ortiz"); Defendant E. Renee Ford ("Defendant Ford"); Defendant Wilmer K. Thomas, Jr. ("Defendant Thomas"); Defendant Sharon P. Scott ("Defendant Scott"); and Defendant Peninsula Airport Commission (hereinafter "PAC Defendants").

[2] The PAC Defendants individually moved to dismiss but filed a joint memorandum in support. See Doc. 8.

# I.   BACKGROUND

## A.   Factual Allegations

This action arises out of several text and Facebook messages about Plaintiff Ken Spirito ("Plaintiff") that were exchanged among the PAC Defendants, reported to the Virginia Department of Transportation ("VDOT"), and published by the Daily Press.  Defendants Ortiz, Ford, and Thomas are or were employed in various capacities by the PAC.  Doc. 1 at 3-4.  Defendant Scott is a Board Member of the PAC and is a member of the City Council of the City of Newport News. Id. at 4.  Plaintiff is an airport management professional who was Executive Director of the PAC from 2009 until he was terminated following the events at issue.  Id. at 5.

In 2014, the PAC Board of Commissioners voted to approve a contractual arrangement with People Express Airlines and voted to guarantee a loan to People Express "in an effort to facilitate its operation at the airport."  Doc. 1 at 6.  People Express "operated briefly, but quickly failed and defaulted on the loan."  Id.  In 2017, VDOT initiated an investigation of the events.  Id. Plaintiff alleges he was targeted as being responsible for the loan's failure, and as "the targeting of Plaintiff became widely known, certain disgruntled PAC employees began a digital whispering campaign of unfounded innuendo that Plaintiff was shredding documentary evidence relevant to the People Express investigation."  Id.

There was no written policy pertaining to shredding, but Plaintiff alleges there was an "unwritten policy" that sensitive documents should be shredded.  Id. at 9-10.  During his tenure as Executive Director, Plaintiff had personally shredded documents regularly and openly, approximately one to two times per week on average for approximately eight years.  Id. at 11.  On March 2, 2017, Plaintiff shredded hard copies of some "old, duplicate airline presentations as part

of his routine duties." Id. at 7. That same day, the following text message exchange occurred between Defendant Ortiz and Defendant Ford:

> Ortiz: "Wow Ken is shredding shredding shredding."
> Ford: "Unbelievable"
> Ortiz: "Seems kinda weird"
> Ford: "This is getting out of hand!"

Id. at 15. On or about March 2, 2017, Defendant Ford notified Commissioners Steve Mallon and Rob Coleman that she had received the messages and conveyed the contents of the messages about shredding to them. Id. Coleman, allegedly acting in his capacity as a Commissioner and as an agent of the PAC, made a report of the shredding allegation to the State Police. Id. The contents of his statement to the police are unknown. Id.

On April 12, 2017, after being terminated for cause, Defendant Thomas sent the following message to Defendant Scott: "I told you I know about that I know about the paper shredding a couple of weeks ago. I saw Jessica and Ken coming from the shredder when I walked in the office after 8pm. Then I was let go about two weeks later..." Id. at 7. On an earlier, unknown date, Defendant Thomas wrote the following text message to Defendant Scott: "I know about the paper shredding at the airport! ..." Id. at 7. Plaintiff further alleges that the PAC Defendants "acted in whole or in part out of ill-will and malice toward Plaintiff in publishing the implied allegations of improper shredding of documents, despite their knowledge that these implied allegations were false, or, at a minimum, their high degree of certainty that they were false." Id. at 13.

The above messages "were further published and transmitted to others, ultimately finding their way into the VDOT Report relating to the People Express investigation and to the front page of the Daily Press," a Virginia newspaper. Id. at 8. Under the heading "The Defamatory Statements," Plaintiff alleges that DP published three separate defamatory editions. First, in its June 2, 2017, online edition, DP ran a story that included the following:

3

> They [VDOT] reported that they had received two separate reports that former executive
> director Ken Spirito had shredded and destroyed documents after the auditors
> asked for airport records. They said they were also given information that Spirito
> had removed records from the airport.

Doc. 1 at 16.  Plaintiff further alleges that the front-page graphic of the June 2, 2017, print version

of the Daily Press featured the text exchanges about shredding discussed above.  Id.

Next, Plaintiff alleges that the front page of the June 3, 2017, edition of the Daily Press

included a "large graphic covering approximately two-thirds of the front page showing an image

of evidentiary material overlaid with pictures" of the above messages about shredding by Plaintiff.

Id. at 2.  The accompanying story in the June 3 edition was about Plaintiff's involvement in the

People Express Contract and loan to People Express.  Id.  Specifically, this article included the

following:

> The [VDOT] auditors blasted the commission's lack of transparency about the deal, and
> reported that they had received two separate reports that former airport executive
> director Ken Spirito had shredded and destroyed documents after they asked for
> records about the payment. They also received reports that he had removed
> documents from the airport.

Id. at 16.

Finally, Plaintiff alleges that a June 3, 2017, editorial in the Daily Press made the following

statements: "This goes beyond losing jobs.  The next question, in light of this audit, becomes

whether Spirito or anyone else needs to be brought up on charges.  Whether anyone needs to go to

prison.  Yes, it's that serious."[3]  Id. at 17.

Plaintiff alleges defamation per se (Count I) and, in the alternative, defamation (Count II)

against all defendants.  He alleges that the above messages are "defamatory statements by

---

[3] This editorial actually appeared in the June 4, 2017, edition of the Daily Press.  See Doc. 24 at 8.  Plaintiff has
waived his objection to this editorial as opinion protected by the First Amendment.  Doc. 31 at 17.  Accordingly, the
Court's remaining analysis considers only the June 2 and June 3 statements.

implication about the 'shredding' of evidence related to a VDOT investigation of the People Express operation at the Peninsula Airport." Id. at 2.

**B.    Procedural History**

On January 17, 2018, Plaintiff filed a defamation action in state court against the PAC Defendants based on the same facts at issue in this case. See Ken Spirito v. Peninsula Airport Commission Newport News/Williamsburg International Airport, Lisa M. Ortiz, E. Renee Ford, Wilmer K. Thomas, Jr. and Sharon P. Scott, Case No. CL 18-103; Doc. 9 at 1. After a hearing on April 13, 2018, the state court sustained the PAC Defendants' demurrer and gave Plaintiff leave to amend his Complaint. Doc. 14-1 at 88-89. On April 27, 2018, the state court entered a Nonsuit Order, Doc. 9-1 at 280, and on May 23, 2018, Plaintiff filed the present action against the PAC Defendants and Daily Press. Doc. 1.

On June 19, 2018, the PAC Defendants filed their Motions to Dismiss for Failure to State a Claim and joint Memorandum in Support. Docs. 3-8. On the same day, the PAC Defendants filed a Motion for the Court to Take Judicial Notice of Plaintiff's lawsuit in the Circuit Court of Williamsburg/James City County, and a Motion to Sever their claims from those brought against Daily Press, Doc. 11. On July 3, 2018, the PAC Defendants filed another Motion for the Court to Take Judicial Notice of the April 13, 2018, Demurrer Hearing before the Circuit Court of Williamsburg/James City County. Doc. 14. Plaintiff filed his Opposition to these Motions on July 3, 2018. Doc. 16.

On August 10, 2018, Daily Press filed a Motion to Dismiss, Doc. 23, and a Motion to Sever its claims from those brought against the PAC Defendants, Doc. 25. Plaintiff filed his Opposition to these Motions on August 24, 2018, Docs. 31-32, and DP filed its Replies on August 30, 2018, Docs. 33-34.

## II.    THE PAC DEFENDANTS' MOTIONS FOR JUDICIAL NOTICE

### A.    Legal Standard

Federal Rule of Evidence 201 provides that a court may judicially notice a fact "that is not

subject to reasonable dispute because it . . . can be accurately and readily determined from sources

whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.  Pursuant to this rule, "a

federal court may consider matters of public record such as documents from prior state court

proceedings in conjunction with a Rule 12(b)(6) motion." Walker v. Kelly, 589 F.3d 127, 139 (4th

Cir. 2009).  A court "must" take judicial notice when a party requests it, and the court is supplied

"with the necessary information." Fed. R. Evid. 201.  However, this mandate applies only to

"adjudicative facts," which are defined as "the facts of the particular case"; no evidentiary rule

deals with judicial notice of other information. Fed. R. Evid. 201 advisory committee notes to

1972 Proposed Rules.

### B.    Analysis

The PAC Defendants have moved the Court to take judicial notice of the entire case file

for the state action Plaintiff filed against them on January 18, 2018, in the Circuit Court of

Williamsburg/James City County.  See Ken Spirito v. Peninsula Airport Commission Newport

News/Williamsburg International Airport, Lisa M. Ortiz, E. Renee Ford, Wilmer K. Thomas, Jr.

and Sharon P. Scott, No. CL 18-103 (Va. Cir. Ct. Jan. 18, 2018); Doc. 9 at 1.  They have also filed

a motion for this Court to take judicial notice of the April 13, 2018, demurrer hearing in which the

state court judge sustained the PAC Defendants' demurrer and granted Plaintiff leave to amend his

complaint. Doc. 14-1 at 88-89.  In total, the PAC Defendants move this Court to notice four

hundred and one (401) pages of documents from Plaintiff's state action.  Because "Virginia law

governs this action," they argue "it is entirely appropriate to take judicial notice of a state court's

ruling on virtually the same allegations." Doc. 21 at 1. They further urge that "[i]n light of the need for comity between the state and federal judicial systems, judicial notice is especially appropriate" in this instance. Id. Plaintiff stipulates that this case "as pertaining to the PAC defendants was refiled from an earlier state court proceeding," but argues that the materials offered by the PAC Defendants "do not constitute 'adjudicative facts' under the terms of Rule 201, are irrelevant, and contain numerous items of information that may be inadmissible in this matter on any number of grounds." Doc. 16 at 1.

Neither party offers binding authority on how the Court should dispose of this issue. Of course, the state court action is a matter of public record and may therefore be considered on a motion to dismiss. See Moore v. Flagstar Bank, 6 F. Supp. 2d 496, 500 (E.D. Va. 1997). However, the Court is not constrained by the mandate of Rule 201, since the record contains numerous legal arguments and conclusions which need not be considered "adjudicative facts" in the present case. Cf. Nat. Res. Def. Council v. Sw. Marine, Inc., 39 F. Supp. 2d 1235, 1237 n.1 (S.D. Cal. 1999), aff'd, 236 F.3d 985 (9th Cir. 2000) (finding a "brief is not a 'fact,' legal or adjudicative, but only a legal argument, [so] Fed. R. Evid. 201 is not a bar."). Defendants' argument for comity is also inapposite, as the state court action is no longer pending. See Nautilus Ins. Co. v. Winchester Homes, Inc., 15 F.3d 371, 377 (4th Cir. 1994) (citing the "long-standing rule" that a federal court should "ordinarily decline, for reasons of efficiency and comity, to grant declaratory relief where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties.") (emphasis added and internal quotations omitted). Finally, the state court proceedings are of limited relevance to the instant matter because the complaints in the two actions, while substantially similar, are not identical, and the state court granted Plaintiff leave to amend. Compare Doc. 1 with Doc. 9-1 at 3-16.

7

Given the above considerations, the Court **GRANTS** the PAC Defendants' Motions for Judicial Notice, Docs. 9 and 14, **IN PART**. The Court will take judicial notice of the state court record for the limited purpose of demonstrating the existence of those proceedings. This is consistent with the approach taken by several other courts under similar circumstances. See Missud v. Nevada, 861 F. Supp. 2d 1044, 1054 (N.D. Cal. 2012), aff'd, 520 F. App'x 534 (9th Cir. 2013) ("While many of these documents (i.e., filings and orders in other court proceedings) are judicially noticeable for certain purposes, such as to demonstrate the existence of other court proceedings, they are not judicially noticeable for [Plaintiff's] purpose, which is to demonstrate that his arguments and allegations against Defendants are true."); NuCal Foods, Inc. v. Quality Egg LLC, 887 F. Supp. 2d 977, 984–85 (E.D. Cal. 2012) ("While the court cannot accept the veracity of the representations made in [court filings from another case], it may properly take judicial notice of the existence of those documents and of the 'representations having been made therein.'").

### III. MOTIONS TO DISMISS

#### A. Legal Standards

##### i. Rule 12(b)(6)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint; it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Venkatraman v. REI Sys., Inc., 417 F.3d 418, 420 (4th Cir. 2005) ("In considering a motion to dismiss, we accept

as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff."). A complaint establishes facial plausibility "once the factual content of a complaint allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 256 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 678). Therefore, the complaint need not include "detailed factual allegations" as long as it pleads "sufficient facts to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct." Id. Although a court must accept as true all well-pleaded factual allegations, the same is not true for legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678.

In deciding a motion to dismiss, a court may consider the facts alleged on the face of the complaint as well as "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." Moore, 6 F. Supp. 2d at 500 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (1990)). The court may consider documents attached to the complaint and those incorporated by reference without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. See Pueschel v. United States, 369 F.3d 345, 353 n.3 (4th Cir. 2004) (citations omitted).

### ii. Defamation

To state a claim for defamation in Virginia, a Plaintiff must allege: (1) publication of (2) an actionable statement with (3) the requisite intent. Schaecher v. Bouffault, 772 S.E.2d 589, 594 (Va. 2015) (citing Tharpe v. Saunders, 737 S.E.2d 890, 892 (Va. 2013)). An "actionable" statement is both false and defamatory, and defamatory words are "those tending to harm the reputation of another as to lower him in the estimation of the community or to deter third persons

from associating or dealing with him." Id. at 594 (internal citations omitted). For defamation actions brought by public figures, the "requisite intent" established by the Supreme Court is "actual malice" – knowledge that a statement is false or reckless disregard for whether it is false or not. Sullivan, 376 U.S. at 279-80. "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1968). Actual malice is a subjective standard which must be proved by clear and convincing evidence. See Reuber v. Food Chem. News, Inc. 925 F.2d 703, 714 (4th Cir. 1991); Hatfill v. The New York Times, Co., 532 F.3d 312 (4th Cir. 2008).

Whether a statement constitutes defamation is an issue for the trial judge to determine as a matter of law. Yeagle v. Collegiate Times, 497 S.E.2d 136, 138 (Va. 1998). "Although varying circumstances often make it difficult to determine whether particular language is defamatory, it is a general rule that allegedly defamatory words are to be taken in their plain and natural meaning . . . according to the sense in which they have been used." Bouffault, 772 S.E.2d at 594 (quoting Carwile v. Richmond Newspapers, Inc., 82 S.E.2d 588, 592 (Va. 1954)).

**B.    The PAC Defendants' Motions to Dismiss**

The PAC Defendants have each individually filed Motions to Dismiss for failure to state a claim, Docs. 3-7, and a joint Memorandum in Support, Doc. 8.

*i.    Actual Malice*

The PAC Defendants first argue that Plaintiff has not adequately pleaded actual malice. Doc. 8 at 23. The statements at issue all concern Plaintiff's shredding of documents during a VDOT investigation. Plaintiff alleges that the PAC Defendants' statements give rise to a

10

defamatory implication that Plaintiff was acting improperly or illegally. Doc. 1 at 1. It is undisputed that Plaintiff shredded documents during the investigation. Id. at 13. Therefore, to sustain his claim, Plaintiff must adequately plead that his actions were proper, and that Defendants knowingly or recklessly suggested otherwise. See St. Amant v. Thompson, 390 U.S. 727, 731 (1968). This means Plaintiff must present sufficient factual allegations "to permit the conclusion that the [PAC Defendants] in fact entertained serious doubts as to the truth" of their insinuations. Id.

Plaintiff urges that, as a matter of federal procedure, actual malice can be averred generally. Doc. 18 at 4. However, the Fourth Circuit has held that conclusory assertions of actual malice do not satisfy the federal pleading requirements for a defamation claim. Mayfield v. National Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 378 (4th Cir. 2012). Nevertheless, because "actual malice is a subjective inquiry, a plaintiff 'is entitled to prove the defendant's state of mind through circumstantial evidence.'" Eramo v. Rolling Stone, LLC, 209 F.Supp.3d 862 (W.D. Va. 2016) (quoting Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 668 (1989)). Accordingly, Plaintiff need only plead sufficient facts that, if proven, create a plausible inference that the PAC Defendants published their statements with actual malice. See Ashcroft, 556 U.S. at 678.

Here, Plaintiff has pleaded that he "personally shredded documents regularly, approximately one to two times per week on average for approximately eight years." Doc. 1 at 11. He alleges that he did so in an open area of the office in the clear view of other PAC employees. Id. He further alleges that on the day in question, he was shredding openly and was accompanied by his assistant who witnessed the documents he was shredding. Id. at 13. Plaintiff has not alleged that he ever received complaints about his shredding habits prior to the instant case. Finally, the

11

VDOT Report itself shows that the PAC had no formal record retention policies. If the Court considers these allegations[4] together, it could find that Plaintiff's shredding was an ordinary and public occurrence, even during the VDOT investigation. These allegations further suggest that PAC employees were aware of Plaintiff's regular shredding as an innocent activity. While the actual knowledge of each individual defendant will be borne out with discovery, the Court may plausibly infer that Defendants Ortiz, Thomas, Ford, and Scott entertained serious doubts about whether Plaintiff's shredding on March 2 was improper.

This conclusion is strengthened by Plaintiff's allegations concerning the "digital whispering campaign of unfounded innuendo that Plaintiff was shredding documentary evidence relevant to the People Express investigation." Doc. 1 at 6. Plaintiff avers that Defendants Ortiz, Thomas, Ford, and Scott, "were part of a faction within the Peninsula airport that wished to see Plaintiff removed as Executive Director."[5] Doc. 1 at 12. "[W]hile actual malice cannot be inferred from ill will or intent to injure alone, 'it cannot be said that evidence of motive or care never bears any relation to the actual malice inquiry.'" Eramo, 209 F. Supp. 3d at 872 (quoting Harte-Hanks, 491 U.S. at 688); see also Duffy v. Leading Edge Prods., Inc., 44 F.3d 308, 315 n.10 (5th Cir. 1995) ("[E]vidence of ill will can often bolster an inference of actual malice."). Accordingly, the Court **FINDS** that Plaintiff has adequately pleaded actual malice for the PAC Defendants.

### ii. Defamatory Implication

The PAC Defendants next argue that their statements cannot support the defamatory implication suggested by Plaintiff and are therefore not actionable. They reason: "[t]he text and

---

[4] The Court notes that the content of the VDOT Report may be considered on this Motion along with the allegations contained in the Complaint. See Section III.B.C.i., infra.
[5] Plaintiff also alleges that Defendant Ortiz "contacted Plaintiff and apologized for making the statements because she had no grounds to make them." Doc. 1 at 13. This supports an inference that Defendant Ortiz made such statements with actual malice.

Facebook Messenger messages relied on by Plaintiff do not expressly or implicitly state that Plaintiff was shredding 'evidence,' but rather express disbelief that the executive director of an agency under investigation by the state was shredding anything at all." Doc. 8 at 12. They further state:

> Plaintiff admits he shredded documents.  Plaintiff further admits he shredded documents while the VDOT investigation was ongoing.  If these admitted facts create an inference of impropriety, the PAC Defendants cannot be held liable under a theory of defamation by implication because the PAC Defendants did not manufacture the facts, manipulate facts, or unreasonably juxtapose facts to create the inference.

Id. at 15.  In response, Plaintiff suggests a defamatory implication "arises from the context including, in particular, the fact that there would be no conceivable reason for the declarants to draw attention to the routine activity of shredding documents but for their desire to raise such an implication." Doc. 18 at 14.

To meet the threshold for defamation, a publication must "engender disgrace, shame, scorn, or contempt, or to render one odious, infamous, or ridiculous." Bouffault, 772 S.E.2d at 594. Virginia law recognizes defamation by implication. See, e.g., Pendleton v. Newsome, 772 S.E.2d 759, 763 (Va. 2015) ("In Webb, we reiterated that Virginia law recognizes a claim for defamation by inference, implication or insinuation.").  The question of whether a publication is reasonably capable of defamatory meaning "is a question of law, not fact.  Resolving it is an essential threshold, gatekeeping function of the court before a case is submitted to the jury." Webb v. Virginian-Pilot Media Cos., LLC, 752 S.E.2d 808, 812 (Va. 2014). "In determining whether words and statements complained of in the case are reasonably capable of the meaning ascribed to them by innuendo, every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor." Webb, 752 S.E.2d at 811.  Given the fact-intensive nature of the defamatory implication inquiry, two cases are instructive.

13

In <u>Webb</u>, a high school vice-principal brought a defamation action against a newspaper for implying that he obtained preferential treatment for his son in a disciplinary matter. 752 S.E.2d at 811. The plaintiff alleged that the newspaper created the defamatory implication by "juxtaposing an insinuation of special treatment with the reported facts that he was an assistant principal at another school in the same school system and that he had been a successful pole vaulting coach [at the same school where his sons were] successful pole vaulting team members." <u>Id.</u> The court found that, as a matter of law, the article was not capable of the defamatory meaning the plaintiff ascribed to it. <u>Id.</u> at 812. It reasoned that, although the article "insinuates [the plaintiff's son] may have benefited from special treatment" the "reasonable implication" was that plaintiff was not necessarily the catalyst of such treatment. <u>Id.</u>

The Virginia Supreme Court contrasted <u>Webb</u> with its later holding in <u>Pendleton v. Newsome</u>, 772 S.E.2d 759 (Va. 2015). In that case, the mother of an elementary school student who died after having an allergic reaction at school brought a defamation claim against school administrators who made statements to news media implying she was responsible for her daughter's death. <u>Id.</u> Specifically, the defendants made several comments about how "a parent's responsibility to provide the school with accurate, timely information; a health emergency plan . . . and the medicine necessary to execute the plan" was "key" to preventing such incidents, and "[t]he school . . . relies on parents to follow through." <u>Id.</u> at 761. The Court found that, unlike in <u>Webb</u>, the <u>Pendleton</u> plaintiff was "the sole and unmistakable target of any innuendo she may be able to prove to have resulted from the defendants' statements." <u>Id.</u> at 764. Context was essential: though the defendants' statements were true, "in the context of the alleged publicity attending the case" and the framing of the newspaper's comments as a response to "misinformation," the court

found "it cannot be said at the demurrer stage that [the words] were not capable of conveying the defamatory innuendo that the plaintiff bore responsibility for her child's death." Id.

Pendleton and Webb suggest that the clarity of an implication is dispositive. If a factual statement, given its verbal and practical context, can only lead to one defamatory conclusion, such an implication is actionable. Here, the PAC Defendants published statements about Plaintiff's shredding to superiors and to VDOT officials during a VDOT investigation. Given Plaintiff's contention that he regularly shredded documents, the ongoing investigation, and the alleged "whisper campaign" against Plaintiff, the PAC Defendants' comments about one particular instance of shredding give rise to the unmistakable conclusion that Plaintiff was shredding documents material to the investigation. As Plaintiff has argued, his coworkers would not have commented on innocent conduct but for their desire to imply that it was improper. Such an implication is sufficiently destructive to Plaintiff's professional and personal reputation to constitute defamation. Here, as in Pendleton, the alleged comments were not targeted at any other individual, nor could they reasonably imply that Plaintiff's actions were blameless. Accordingly, the Court **FINDS** that, as a matter of law, the PAC Defendants' statements can sustain the defamatory implication Plaintiff alleges.

### iii.    Opinion

The PAC Defendants next argue that certain parts of the exchange between Defendant Ortiz and Defendant Ford are nonactionable opinion. Specifically, they state "[t]he messages that followed Ms. Ortiz's original message which referred to the shredding as 'Unbelievable,' 'kinda weird,' and 'out of hand,' are plainly opinion as they depend on the speaker's viewpoint and are not capable of being proved true or false." Doc. 8 at 9 n.1. In response, Plaintiff urges that the

implication from these comments, rather than the individual words, contains a factual assertion that he was shredding evidence. Doc. 18 at 14-15.

Whether an alleged defamatory statement contains a provably false factual connotation or is a purely opinion is a matter of law. Bouffault, 772 S.E.2d at 600. The "threshold issue" is whether "the complained of phrase including inference fairly attributable to it could reasonably be interpreted as stating actual facts" about the Plaintiff. Yeagle, 497 S.E.2d at 138. Unlike cases dealing with parody or rhetorical hyperbole, the exchange at issue contains a real implication that Defendant was shredding material information. Cf. Id. (finding a student newspaper's description of the plaintiff-official as "Director of Butt Licking" to be nonactionable opinion); National Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 284-86 (1974) (finding opinion when the defendants defined a labor union "scab" to be a "traitor"). Here, Defendants Ford and Ortiz did not make vague observations about Plaintiff's conduct; they remarked on a single incident. Commentary that one occasion of shredding was "weird" or "out of hand," given the ongoing investigation, carries the necessary implication that such shredding is wrongful – a factual connotation that is provably true or false. See Bouffault, 772 S.E.2d at 600. This factual connotation converts opinion into defamation.

Furthermore, the Court declines to parse the individual lines of this exchange as the PAC Defendants request. Plaintiff has alleged that the entire exchange has a defamatory implication. Further, it is the photograph of the entire exchange that was published in the VDOT Report and later in the Daily Press. As the court found in Pendleton, "[t]he defendants' statements . . . may be true if taken out of context," but all things considered, "it cannot be said at the demurrer stage that they were not capable of conveying the defamatory innuendo" that Plaintiff alleges. 772

16

S.E.2d at 764. Accordingly, the Court **DENIES** the PAC Defendants' Motions to Dismiss on the basis that the statements of Defendants Ortiz and Ford were nonactionable opinion.

### iv.    Individual Defenses

At the hearing, the PAC Defendants asserted several individual defenses. First, they argued that, to the extent Defendant Thomas' emails are actionable, they are not attributable to the PAC because Thomas was not employed by the PAC at the time he sent the message. The Court **RESERVES RULING** on this issue at the motion to dismiss stage.[6]

The PAC Defendants next argued that Defendants Scott and Ford should not be held liable for sharing the messages at issue with the VDOT investigators or others within the PAC, because they merely republished the comments of others. Each publication of a defamatory statement constitutes a separate and distinct tort. See Lewis v. Gupta, 54 F. Supp. 2d 611, 614 (E.D. Va. 1999). Furthermore, "'[r]epetition of another's words does not release one of responsibility if the repeater knows that the words are false or inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted.'" Eramo, 209 F. Supp. 3d at 872 (quoting Goldwater v. Ginzburg, 414 F.2d 324, 337 (2d Cir. 1969), cert. denied, 396 U.S. 1049 (1970)). Setting aside the fact that Defendant Ford participated in the text exchange with Defendant Ortiz, the Court has found that Plaintiff has adequately pleaded actual malice for each PAC Defendant. Accordingly, it **DENIES** the Motions to Dismiss by Defendants Scott and Ford on the basis that they re-published statements by others.

For the reasons stated herein, the Court **DENIES** the PAC Defendants' Motions to Dismiss, Docs. 3-7.

---

[6] Notably, this does not impact the PAC's liability for the actions of the remaining PAC Defendants.

## C.    The Daily Press, LLC's Motion to Dismiss

DP moves to dismiss on two[7] bases: its articles are protected by the Virginia "fair report"

privilege, and Plaintiff has failed to plead actual malice.

### i.    Fair Report Privilege

Virginia law affords a fair report privilege, in which "[t]he publication of public records to

which everyone has a right of access is privileged, if the publication is a fair and substantially

correct statement of the transcript of the record." Dangerfield v. WAVY Broad., LLC, 228 F.

Supp. 3d 696, 701 (E.D. Va. 2017) (quoting Alexandria Gazette Corp. v. West, 198 Va. 154, 93

S.E.2d 274, 279 (Va. 1956)).  A defendant cannot invoke the fair report privilege if it abuses that

privilege.  Alexandria Gazette, 93 S.E.2d at 279.  Such abuse occurs if a publication is not made

in good faith or is not a "substantially accurate account of the public record or proceeding."  Id.

However, the privilege is not lost if the record is incorrect or if it contains falsehoods.  Id. (quoting

Times-Dispatch Publ'g Corp. v. Zoll, 139 S.E. 505, 507 (Va. 1927)).  "It is not necessary that the

published report be verbatim, but it must be substantially correct."  James v. Powell, 152 S.E. 539,

545 (Va. 1930).

DP first moves to dismiss Plaintiff's defamation claims on the basis that the Daily Press

editions at issue are fair reports of the VDOT audit report ("VDOT Report").  In support of this

contention, DP avers that the "front-page graphics" of the June 3, 2017, print edition article to

which Plaintiff objects "are simply a re-publication of the text message and other images found in

the VDOT Audit Reports."  Doc. 24 at 15.  It further argues that the two statements from DP's

June 2 and June 3 articles highlighted in the Complaint "are virtually verbatim summaries of the

---

[7] DP originally made four arguments in its Motion to Dismiss. The third was that its June 4, 2017, editorial was
protected as fact-based opinion, and the fourth was premised on Virginia's Anti-SLAPP statute. However, the
parties have narrowed the issues to two, since Plaintiff waived his objection to the June 4 editorial, Doc. 31 at 17,
and DP has conceded that the Anti-SLAPP statute does not apply, Doc. 33 at 12.

VDOT Audit Report statements." Id. Accordingly, "a simple comparison of the Daily Press' articles to the publicly available VDOT FINAL Report demonstrates that the Daily Press' publication was 'a fair and substantially correct statement of the transcript of the record.'" Doc. 24 at 16 (citing Alexandria Gazette, 93 S.E.2d at 279).

In response, Plaintiff argues that DP abused the fair report privilege and therefore loses its protection. Doc. 31 at 17. Here, Plaintiff contends that DP did not accurately describe the VDOT Report because it "did more than simply reprint the text messages; it juxtaposed those messages on top of pictures of evidentiary documents with the intention of creating a devastating defamatory implication." Doc. 31 at 1. According to Plaintiff, the implication of DP's cover and articles was that Plaintiff was "[d]estroying evidence to impede a government investigation." Id.

As a preliminary matter, the Court must have access to the VDOT Report to compare the contents of the report with the DP articles. Plaintiff argues that the VDOT Report in its entirety is not admissible on a 12(b)(6) Motion, because the document is not "[c]entral to the claims in the Complaint." Doc. 31 at 2. However, as DP correctly points out, this Court has held that:

> [W]hen a plaintiff fails to introduce a pertinent document as part of his complaint, the defendant may attach the document to a motion to dismiss the complaint and the Court may consider the same without converting the motion to one for summary judgment. This ruling encompasses not only documents quoted, relied upon, or incorporated by reference in the complaint, but also official public records pertinent to the plaintiffs' claims. There is but one limitation: the document must be one of unquestioned authenticity.

Gasner v. Cty. of Dinwiddie, 162 F.R.D. 280, 282 (E.D. Va. 1995); see also Blankenship v. Manchin, 471 F.3d 523, 526 n.1 (4th Cir. 2006). Moreover, the Court is permitted to take judicial notice of official public records. See Moore, 6 F. Supp. at 500. Because the VDOT Report is a public report of a governmental agency, and Plaintiff has not disputed its authenticity, the Court FINDS that it may consider the contents of the report in evaluating DP's Motion to Dismiss.

In view of Plaintiff's waiver of the June 4 editorial, the Court must only consider the following excerpts of the Daily Press articles, juxtaposed with images of documents pulled from the VDOT Report:

> They [VDOT] reported that they had received two separate reports that former executive director Ken Spirito had shredded and destroyed documents after the auditors asked for airport records. They said they were also given information that Spirito had removed records from the airport. Doc. 1 at 16 (citing the June 2, 2017, online article);

> The [VDOT] auditors blasted the commission's lack of transparency about the deal, and reported that they had received two separate reports that former airport executive director Ken Spirito had shredded and destroyed documents after they asked for records about the payment. They also received reports that he had removed documents from the airport. Id. (citing June 3, 2017, print edition).

It appears that this information was taken directly from the VDOT Report. For example, Page 43 of the report, under the heading "Shredding" states: "There were two separate accounts in which the Executive Director [Plaintiff] was observed destroying documents within the PAC office." Doc. 24 at Ex. 1 (hereinafter "VDOT Report"), p. 43. Page 45 of the report states "During our review, we were also provided information that the Executive Director was observed removing records from the airport." VDOT Report at 45. Page two (2) of the report states "PAC administrative staff, including the Executive Director [Plaintiff], did not always provide complete, open, and timely disclosure of key and/or material interests to the Commission." Id. at 2. Under the heading "Obstacles that Delayed or Limited Our Review," the report lists "PAC documents and records that may have been destroyed and not retained." Id. at 11. Finally, under the heading "Record Retention Policies and Procedures," the report states: "Our comparison of the Executive Director's [Plaintiff's] email that was provided to us as being 'everything' to what we were provided from other outside sources indicated that many of the emails that should have been located in the Executive Director's email were no longer there." Id. at 43. Although the VDOT Report does not explicitly state that Plaintiff impeded its investigation by, inter alia, shredding

material information, it suggests that he did; the report would likely not have mentioned Plaintiff's shredding unless it was relevant to the investigation. The DP articles at issue contain this same inference. Accordingly, DP appears to have reported the content of the VDOT Report in a substantially accurate manner.

Nor does the juxtaposition with images – again, taken directly from the VDOT Report – significantly change the implication that is already contained in the report. Plaintiff urges that overlaying the images of the text messages and random pages from the report (handwritten notes, an email, and a letter on Commonwealth letterhead) creates a defamatory inference that Plaintiff was shredding evidence material to the VDOT investigation. While Virginia law recognizes defamation by implication, see, e.g., Pendleton v. Newsome, 772 S.E.2d at 763, courts analyzing the fair report privilege suggest that a newspaper must add something to the content of a report to support a defamation claim.

For example, in Horne v. WTVR, LLC, the Court declined to apply the fair report privilege to a news station moving for summary judgment. No. 3:16-CV-000092-JAG, 2017 WL 1330200, at *5 (E.D. Va. Apr. 6, 2017), aff'd, 893 F.3d 201 (4th Cir. 2018) (unreported). In that case, a Virginia school mistakenly hired the plaintiff, an ex-felon, which was against the law. Id. In reporting the story, the defendant-news station aired an interview of a school official describing the hiring process, while the banner at the bottom of the screen read: "Felon Hired, Then Fired: How Prince George Schools Prevents This." Id. at *2. The Fourth Circuit found that the juxtaposition of the interview, which did not concern the plaintiff, and the TV banner created a defamatory implication that the school was commenting on its hiring of the plaintiff. Id. As such, it found that WTVR had abused its fair report privilege and was thus not entitled to its protection.

21

Horne illustrates that abuse occurs when a news station adds information to its original source, changing the source's substantial meaning.

Here, DP did not juxtapose images or commentary from different sources to create a heightened inference of wrongdoing by the Plaintiff; it merely took images from the VDOT Report to illustrate a suggestion contained in the report itself. As long as DP's representation of the report was substantially accurate, selective representation of the report's contents does not constitute abuse. Cf. Alexandria Gazette, 93 S.E.2d at 281-82 (finding the fair report privilege applied when, "while the news article was not exactly correct, it constituted no substantial departure from the language" in the underlying document); Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 254-55 (4th Cir. 1988) (rejecting the plaintiff's argument that certain quotes were taken out of context and finding that "[t]he privilege does not require that the published report be verbatim . . . while references to the order of events may not be entirely accurate, the quoted portions of the sentences are accurate quotes and the sentences themselves are substantially correct accounts . . . ."); Ditton v. Legal Times, 947 F. Supp. 227, 231 (E.D. Va. 1996) ("In the absence of evidence indicating abuse of the privilege protecting the publisher, the prerogative to exercise editorial judgment rightfully belongs to the publisher's editors, not to the judiciary."); Ramey v. Kingsport Pub. Corp., 905 F. Supp. 355, 358 (W. D. Va. 1995) (finding no abuse when the official source "taken as a whole . . . set forth evidence tending to support the inference" contained in the newspaper article).

DP urges the court to consider the policy ramifications of allowing this case to proceed. It argues: "if a newspaper could not report on the contents of a publicly available governmental report highlighting issues of public concern involving actions of a governmental agency, Peninsula Airport Commission, and its commissioners and executive director, then the First Amendment's

22

guarantee of freedom of the press would be eviscerated and the fair report Privilege would have no function." Doc. 33 at 2. It is true that, "[a]lthough Virginia's common law of libel governs this diversity case, the First Amendment's press and speech clauses greatly restrict the common law where the defendant is a member of the press, the plaintiff is a public figure, or the subject matter of the supposed libel touches on a matter of public concern." Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1091-92 (1993) (citing Sullivan, 376 U.S. 254). Where, as here, "all of these considerations are present, the constitutional protection of the press reaches its apogee." Id. The Fourth Circuit has described the interaction of the fair report privilege and the First Amendment as follows:

> While the news media of necessity has something of an adversarial relationship with government officials, that relationship coexists with the function recognized by the fair report privilege simply to inform citizens of what the government is doing. Government documents serve as the basic data of governmental operations . . . In return for frequent and timely reports on governmental activity, defamation law has traditionally stopped short of imposing extensive investigatory requirements on a news organization reporting on a governmental activity or document. Inevitably, this reduces the chances that a news organization could actually know that a government report contained false charges or could maintain serious doubts about them.

Reuber, 925 F.2d at 712-13. Accordingly, DP did not violate the fair report privilege by relying on the representations contained in the VDOT Report, even if that report contained suggestions that were untrue. The policy underlying the fair report privilege advises that DP is entitled to dismissal before it incurs further litigation costs, lest similar defamation claims have a chilling effect on government reporting.

While most cases analyzing the fair report privilege contemplate later stages of litigation, a Court may apply the privilege as a matter of law when "the facts are not in dispute and reasonable people could not differ [as to] whether or not the publication constitutes a substantial departure from the public record . . . ." Rush v. Worrell Enters., Inc., 21 Va. Cir. 203, 1990 WL 751410 at

*3; see also Alexandria Gazette, 93 S.E.2d at 291-92 (finding that "[t]he facts upon which the claim of privilege is based and the question of its abuse are so free from dispute as to require that it be held, as a matter of law, that the publication was privileged, and there was no abuse of the privilege."). Here, there are no facts in dispute because the Court has access to the VDOT Report and the articles at issue. Plaintiff has furthermore not alleged sufficient facts to indicate bad faith by the Daily Press.[8] Given the undisputed facts, the Court **FINDS** that the challenged Daily Press publications were substantially accurate as to the contents of the VDOT Report, and the Daily Press is therefore protected by the fair report privilege as a matter of law. Accordingly, the Court **GRANTS** the Daily Press, Inc.'s Motion to Dismiss, Doc. 23.

*ii.     Actual Malice*

DP next moves for dismissal based on Plaintiff's failure to adequately plead actual malice. Because the Court **FINDS** that Daily Press is protected by the fair report privilege, it need not reach this issue.

### IV.    MOTIONS TO SEVER

The PAC Defendants and the Daily Press move to sever the cases against them. Docs. 11, 25. Plaintiff has opposed these Motions. Docs. 17, 32. Given the Court's dismissal of all claims against the Daily Press, the Motions to Sever, Docs. 11, 25, are **DISMISSED AS MOOT.**

### V.    CONCLUSION

For the reasons stated herein, the Court **GRANTS** the PAC Defendants' Motions for Judicial Notice, Docs. 9, 14, **IN PART; DENIES** the PAC Defendants' Motions to Dismiss, Docs.

---

[8] In fact, Plaintiff notes that a Daily Press reporter attempted to investigate the shredding allegations in the VDOT Report by calling Plaintiff – something a newspaper is not required to do under the privilege. See Reuber, 925 F.2d at 716 ("Failure to investigate . . . does not in itself establish bad faith.") (internal quotations omitted).

3-7; **RESERVES RULING** on the issue of respondeat superior as it pertains to Defendant

Thomas; **GRANTS** the Daily Press, LLC's Motion to Dismiss, Doc. 23, and **DENIES** Defendants'

Motions to Sever, Docs. 11, 25, **AS MOOT**.

    The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

    It is so **ORDERED**.

                          /s/
                   Henry Coke Morgan, Jr.
                   Senior United States District Judge
                   HENRY COKE MORGAN, JR.
                   SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, VA
November 21, 2018