IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
(Newport News Division)

KEN SPIRITO,

      Plaintiff,

v.                                      Case No. 4:18-cv-58

PENINSULA AIRPORT COMMISSION,
etc., et al.

      Defendants.

## LISA M. ORTIZ'S MEMORANDUM IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

### Preliminary Statement

      Lisa M. Ortiz ("Ms. Ortiz") is being sued for defamation because she accurately reported

to her superior that the Executive Director of the Peninsula Airport Commission ( the

"Commission"), while the Commission was the subject of an audit, had engaged in shredding of

documents during the VDOT audit on the morning of March 2, 2017 prior to a special meeting of

the Commission convened that afternoon to deal with complaints that Commission documents

were not being produced to the auditors.  At the time Ms. Ortiz made this true report, she was

aware that the *Daily Press* had publicized that the VDOT auditors and Secretary of

Transportation Aubrey Layne had complained that documents were not being produced by the

Commission.  The February 28, 2017 article in the *Daily Press* contained the following:

> **"That audit is likely to take longer than expected because the Commission is
> not providing documents investigators have requested,** in some cases two or
> three times, and because commission staff have not made themselves available,
> said Virginia Secretary of Transportation Aubrey Layne."

> **"Based on information we've received, we are broadening the scope of the
> investigation,"** Layne said.  "The state takes very seriously the use of its money –
> We're fiduciaries; this is taxpayers' money and that's what's really got me
> going." (emphases added)

"Layne said investigators with the inspector general's office and office of the attorney general are looking at other ways to get the information they have been asking the commission to provide."

The text message exchange is set out in paragraph 27 of the Complaint as follows:

Ortiz: *"Wow Ken is shredding shredding shredding."*

Ford: *"Unbelievable"*

Ortiz: *"Seems kinda weird"*

Ford: *"This is getting out of hand!"*

Ms. Ortiz's sent her text message to her superior, Renee Ford, because Ms. Ford was not in the office. She testified:

A. So I always tell Renee anything that I have, I still continued to do that, the position I'm in. I report to her and if I don't agree with something or I don't think something is right in what I see in my job capacity, I tell her. She was not there obviously, so I texted her. Part of it was in shock, like joke shock kind of. The other part was in like really, he's shredding.

Ortiz dep. p. 26, lines 11-18. Ms. Ortiz did not distribute the text messages to any other person at any other time. At the time Ms. Ortiz sent the text messages, she had a good relationship with Mr. Spirito.

The Plaintiff's allegation is that Ms. Ortiz must have possessed common law and actual malice because the shredding by the Executive Director on the morning of March 2, 2017 should not have been reported to anyone. However, reporting to her immediate superior that the chief executive officer of the organization under audit scrutiny was shredding documents during the investigation does not establish actual or common law malice. All Ms. Ortiz did was report a fact that should have been reported. The report was privileged, there is no clear and convincing evidence of common law malice, and there is no evidence of actual malice.

## Undisputed Facts Regarding Ms. Ortiz

1.      Everyone in the PAC office, including Ms. Ortiz, was aware of the audit by the Virginia Department of Transportation which was announced on January 27, 2017.

2.      The audit and the PEX loan guaranty were covered in 26 articles in the *Daily Press* between January 26, 2017 and March 2, 2017, the vast majority of which were highly critical of the Commission and its Executive Director.

3.      The February 21, 2017 article in the *Daily Press* quoted Secretary of Transportation Aubrey Layne as saying, "Our guys are asking for records and so far, they haven't been forthcoming." Layne is further quoted, "We're still trying to get to the bottom of where the money went."

4.      The February 28, 2017 *Daily Press* article reported that Mr. Spirito and the Commission's then attorney were asked to leave the room at a February 27, 2017 special meeting. The *Daily Press* reported,

> That audit is likely to take longer than expected because the Commission is not providing documents investigators have requested, in some cases two or three times, and because Commission staff have not made themselves available, said Secretary of Transportation Aubrey Layne.

5.      The fact of the audit and the negative publicity was creating tension in the office.

6.      Ms. Ortiz was aware when she sent the text messages that a special meeting of the Commission had been scheduled for that same day, March 2, 2017.

7.      On the morning of March 2, 2017, prior to 8:28 a.m., Ms. Ortiz heard and witnessed Mr. Spirito shredding documents.

8.      Ms. Ortiz regularly reports anything unusual to her superior Renee Ford, and she reported the fact that Mr. Spirito was "shredding, shredding, shredding."

9.      Mr. Spirito admits shredding documents on March 2, 2017.

I-1585133.2

10.     Two other PAC employees, Rowena Byrd and Jessica Minor heard the shredding and confirmed it was unusual.

11.     After March 2, 2017, the Commission reiterated to all employees that they must cooperate fully with the auditors and to provide any information requested by the auditors.

12.     Ms. Ortiz did not discuss Mr. Spirito's shredding with the VDOT auditors.

13.     Ms. Ortiz did not provide any information to the VDOT auditors.  (Ortiz Dep. page 45, lines 1-8).

14.     She also has not provided any information to the Commission regarding the shredding.  (Ortiz Dep. page 44, lines 4-10).

15.     Ms. Ortiz was not aware, until this litigation, that Ms. Ford had contacted Commissioner Mallon and Commissioner Coleman and she was not aware that Commissioner Coleman had made a report to the state police.

16.     Except to Ms. Ford, Ms. Ortiz did not speak to any Commissioner or any Commission employee about the shredding after March 2, 2017 until after the *Daily Press* articles about the VDOT audit appeared.

17.     Ms. Ortiz explained why she sent the message:

A.     What I concluded was he was shredding in the middle of an audit when all of this was unfolding.  Like I said, it seemed kind of weird. I've never heard him shred to that degree.

(Ortiz Dep. page 30, line 25 through page 31, line 3).

18.     Ms. Ortiz further explained:

A.     So I always tell Renee anything that I have, I still continue to do that, the position I'm in.  I report to her and if I don't agree with something or I don't think something is right in what I see in my job capacity, I tell her.  She was not there obviously, so I texted her.  Part of it was in shock, like joke shock kind of.  The other part was in like really, he's shredding.

(Ortiz Dep. p. 26, lines 11-18).

4

19.     Ms. Ortiz was not aware of the Facebook Messenger message Mr. Thomas sent to Ms. Scott until they were published in the *Daily Press*.

The deposition transcripts of Bradley Gales (**Exhibit A**), Lisa Ortiz (**Exhibit B**), Renee Ford **Exhibit C**), Sharon Scott (**Exhibit D**) and Wilmer Thomas (**Exhibit** E) are attached hereto and made a part hereof.

I.     MS. ORTIZ'S COMMUNICATION TO MS. FORD WAS PRIVILEGED AND THERE IS NO EVIDENCE THE PRIVILEGE WAS ABUSED

Under the Common Interest Privilege recognized by Virginia law, an employee has an absolute right, if not a duty, to report facts relating to the operation of the enterprise to her superior. This privilege may be defeated only by clear and convincing evidence of common law malice. Common law malice is spite, hatred and ill will. The protection of a qualified privilege is afforded because:

> [p]ublic policy and the interest of society demand that in cases such as this an employer, or his proper representatives, be permitted to discuss freely with an employee, or his chosen representatives, charges affecting his employment which have been made against the employee to the employer. There is a privilege on such occasions and a communication made under such circumstances, within the scope of the privilege, without malice in fact, is not actionable, even though the imputation be false, or founded upon erroneous information. The question is not as to the truth or falsity of the communication, or whether the action taken by the defendant with reference thereto or based thereon was right or wrong, but whether the defendant in making the publication acted in good faith or was inspired by malice.

Chesapeake Ferry Co. v. Hudgins, 155 Va. 874, 906-07 (1931).

It was appropriate for Ms. Ortiz to report to her superior Mr. Spirito's shredding of documents on the morning where a special meeting had been called to deal with the ongoing VDOT audit and where the press had reported that the Secretary of Transportation had complained strongly and vigorously about the Commission's failure to produce documents. Therefore, Ms. Ortiz's text messages are protected by the Common Law Privilege.

The Supreme Court of Virginia has applied the qualified privilege in a number of cases involving defamatory statements made between co-employees and employers in the course of employee disciplinary or discharge matters. Se. Tidewater Opportunity Project, Inc. v. Bade, 246 Va. 273 (1993); Oberbroeckling v. Lyle, 234 Va. 373 (1987); Great Coastal Express, Inc. v. Ellington, 230 Va. 142 (1985); Montgomery Ward & Co. v. Nance, 165 Va. 363 (1935); Thalhimer Bros. v. Shaw, 156 Va. 863 (1931); Chesapeake Ferry Co. v. Hudgins, 155 Va. 874 (1931); and Chalkley v. Atl. Coast Line R.R. Co., 150 Va. 301, 306 (1928).

In Mann v. Heckler & Koch Defense, Inc., 639 F. Supp. 2d 619, 637 (E.D. Va. 2009), aff'd, 630 F.3d 338 (4th Cir. 2010), the court articulated the importance of the privilege as follows:

> The e-mail was sent to six of Mann's subordinates and colleagues. These are persons with a duty or interest in Mann's absence from work. Further, the e-mail served a corporate purpose: to inform the recipients that Mann was absent and would continue to be so, and to instruct them how to handle issues that might arise, in Mann's absence. "Public policy and the interest of society demand that . . . an employer, or his proper representatives," be able to freely conduct conversations such as that in this case, to inform employees about the absence of another and how to business should be continued in light of that absence. *Larimore*, 528 S.E.2d at 121 (*quoting Chesapeake Ferry Co. v. Hudgins*, 155 Va. 874, 156 S.E. 429, 441 (1931)).

Even though the plaintiff contended that the defendant "seemed angry," the court nonetheless applied the privilege holding:

> Given the presumption against malice, the lack of any malice evident from the face of the Weber e-mail, and the lack of any evidence showing that Weber sent this communication maliciously, the Court finds that Plaintiff's defamation claim also fails as a matter of law because it is protected by a qualified privilege. The Court will grant Defendant's motion for summary judgment on Count III.

Id. at 637.

In Jafari v. Old Dominion Transit Management Co., 913 F. Supp. 2d 217 (E.D. Va. 2012), aff'd, 538 F. App'x 238 (4th Cir. 2013), the court said:

The doctrine of qualified privilege applies to statements "made between co-employees and employers in the course of employee disciplinary or discharge matters," provided that the statement is not made with malice. *Larimore v. Blaylock*, 259 Va. 568, 572, 528 S.E.2d 119 (Va. 2000); *see also Southeastern Tidewater Opportunity Project v. Bade*, 246 Va. 273, 275-76, 435 S.E.2d 131 (Va. 1993). "[E]mployment matters are occasions of privilege in which the absence of malice is presumed . . . [but] [t]his privilege is lost if defamatory statements are communicated to third parties who have no duty or interest in the subject matter, even if those third parties are fellow employees." *Larimore*, 259 Va. at 574-75, 528 S.E.2d 119. When a defendant makes a statement within the scope of qualified privilege, "without malice in fact, [the statement] is not actionable, *even though the imputation is false, or founded upon erroneous information." Id.* at 573, 528 S.E.2d 119 (quoting *Chesapeake Ferry Co. v. Hudgins*, 155 Va. 874, 906-07, 156 S.E. 429 (Va. 1931)) (emphasis added). The truth or falsity of the statement, therefore, is not material. Rather, the speaker's motivation in making the statement is determinative.

Id. at 223.

In <u>Taylor v. CNA Corp.</u>, 782 F. Supp. 2d 182 (E.D. Va. 2010), the court said:

The publication requirement for defamation requires a dissemination of the statement to a third party where that dissemination does not occur in a privileged context. *See Montgomery Ward & Co. v. Nance*, 165 Va. 363, 379, 182 S.E. 264 (1935). In this regard, it is well-settled under Virginia law that "communications between persons on a subject in which the persons have an interest or duty are occasions of privilege," and that "statements made between co-employees and employers in the course of employee disciplinary or discharge matters are privileged." *Larimore v. Blaylock*, 259 Va. 568, 572, 528 S.E.2d 119 (2000); *see also Southeastern Tidewater Opportunity Project, Inc. v. Bade*, 246 Va. 273, 275, 435 S.E.2d 131 (1993) (holding that a letter was privileged because it "was written in the context of his employment relationship"). Thus, the privilege applies broadly to all statements related to "employment matters," provided the parties to the communication have a duty or interest in the subject matter. *Larimore*, 259 Va. at 574-75, 528 S.E.2d 119. And, employees have a general duty "to inform management of adverse or improper actions by fellow employees," just as management has a duty "to investigate and make decisions regarding matters of continued employment." *Id.* at 575, 528 S.E.2d 119. It is also settled that this privilege is qualified and is lost "if a plaintiff proves by clear and convincing evidence that the defamatory words were spoken with common-law malice." *Southeastern Tidewater*, 246 Va. at 276, 435 S.E.2d 131; *see also Larimore*, 259 Va. at 572, 528 S.E.2d 119. Common-law malice, in turn, is "behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made." *Southeastern Tidewater*, 246 Va. at 276, 435 S.E.2d 131. In other words, to avoid the qualified privilege plaintiff must show that "the communication was actuated by some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff." *Id.*

7

Id. at 201-02.

In <u>Adler v. Virginia Commonwealth Univ.</u>, 259 F. Supp. 3d 395 (E.D. Va. 2017), <u>aff'd</u>,

709 F. App'x 189 (4th Cir. 2018), the court ruled:

> As to Ripley, the Court finds that her audit reports are privileged. Qualified privilege attaches to communications "between persons on a subject in which the persons have an interest or duty." *Cashion*, 286 Va. at 337, 749 S.E.2d at 532 (citation and quotation marks omitted). In this case, Ripley published her reports only to employees at VCU who had an interest in the study or in the results of the audit. Accordingly, the Court finds that qualified privilege attaches to Ripley's audit reports.

Id. at 409 10.  While the court held that the qualified privilege could be overcome by clear and

convincing evidence of malice, the court ruled that "[a] plaintiff, however, cannot satisfy his

burden with only unsupported and conclusory statements." Id. at 410.

Even if one ignores Secretary Layne's public criticism of the Commission for failing to

provide documents to the auditors, reporting the shredding of documents by the subject of an

investigation during the investigation qualifies for the privilege.  This is so even if the Court

determines that it was appropriate for the Executive Director to shred documents during the audit

in spite of the prohibition of Section 42.1-86.1(A) prohibiting the destruction of public

documents during an audit and even if the Court determines that a litigation hold was not

mandatory.[1]  An employee has a right, if not a duty, to report document destruction by the

subject of an investigation during the investigation.

The Common Law Privilege may be defeated by clear and convincing evidence of

common law malice, i.e., spite, hatred or ill will.  However, there is no such evidence in the

instant case.  At the time the communication was made, Ms. Ortiz had a good relationship with

Plaintiff.

---

[1] Ms. Ortiz asserts that the destruction of public records during the audit is illegal and that a document hold should have been instituted until the auditors obtained the documents they requested.

II. MS. ORTIZ IS NOT RESPONSIBLE FOR THE COMMUNICATIONS BETWEEN WILMER THOMAS AND SHARON SCOTT

Ms. Ortiz is not only being sued because of the text messages she sent to her superior, but she is also being sued because Wilmer Thomas sent Facebook Messenger messages to Sharon Scott, a Commissioner and a member of Newport News City Council. Ms. Ortiz did not know about the Facebook Messenger messages until she learned about them in an article written in the *Daily Press*. Mr. Thomas was not aware of Ms. Ortiz's text message to Ms. Ford when he sent his Facebook Messenger message to Ms. Scott. Mr. Thomas distributed his Facebook Messenger messages, which are the subject of this action, to Ms. Scott after he had been terminated by the Commission. Ms. Scott shared the Facebook Messenger messages with no one until asked by the auditors and the auditors were the only persons to whom she provided the Facebook Messenger messages. The idea that Ms. Ortiz has any responsibility for Mr. Thomas's statement has no factual or legal foundation.

III. PLAINTIFF MUST PROVE <u>NEW YORK TIMES</u> ACTUAL MALICE

Plaintiff concedes he is subject to the <u>New York Times</u> actual malice test. In response to Requests for Admission Nos. 12 and 13 filed by the *Daily Press*, Plaintiff stated, "Plaintiff admits that pursuant to Virginia law for purposes of this litigation Plaintiff was a limited purpose public figure." The actual malice test applies to limited purpose public figures.

In addition, it is clear that Plaintiff is a public official. The Commission is a creature of statute formed in 1946 by an Act of Assembly passed by the General Assembly. The Commission has been held by the Supreme Court of Virginia to be a political subdivision of the Commonwealth. <u>Cty. of York v. Peninsula Airport Comm'n</u>, 235 Va. 477 (1988).

Plaintiff was the Executive Director of the airport. As the Executive Director, he had executive authority over all operations of the airport subject only to the direction and guidance of

the Commission.  In <u>Rosenblatt v. Baer</u>, 383 U.S. 75 (1966), the Supreme Court made it plain

that the public official status was broad and would apply to anyone who had or appeared to have

substantial authority for or control over the conduct of governmental affairs as follows:

> It is clear, therefore, that the "public official" designation applies at the very least
> to those among the hierarchy of government employees who have, or appear to
> the public to have, substantial responsibility for or control over the conduct of
> governmental affairs.

<u>Id.</u> at 85.  Mr. Spirito plainly had and appeared to have substantial responsibility over the control

or conduct of governmental affairs.  The executive director of a major airport clearly qualifies as

a public official.

In <u>Horne v. WTVR, LLC</u>, 893 F.3d 201 (4th Cir. 2018), the Fourth Circuit acknowledged

that the public official status applied to any official who had or appeared to have substantial

responsibility for or control over the conduct of governmental affairs but then went on to  say

that, "[B]ecause we have infrequently faced this issue, we supplement this understanding with

the non-precedential decisions of other courts."  <u>Id.</u> at 207.  The court discussion made it plain

that the public official category was broad enough to include many public employees who were

not in charge of the agency.  The notion that the chief executive officer of a public agency would

not be considered a public official has no support of any kind.

IV.     MS. ORTIZ DOES NOT POSSESS CONSTITUTIONAL ACTUAL MALICE

For Ms. Ortiz to possess constitutional actual malice, she would have had to know what

Mr. Spirito shredded and that it was appropriate for him to be shredding those documents at that

time.  The evidence is undisputed that Ms. Ortiz did not know what Mr. Spirito was shredding.

If she did not know what Mr. Spirito was shredding, she could not have possibly known that it

was appropriate for him to be doing so even if it were appropriate for the subject of an

investigation to be shredding anything during the investigation.  The head VDOT auditor,

I-1585133.2

Bradley Gales, testified that he does not believe the subject of an investigation should shred anything during an audit. (Gales Dep. p. 41).

Even if one believes it might be appropriate for the subject of an investigation to shred documents during an audit, it is plainly appropriate to report document shredding during an audit when the person making the report does not know what is being shredded. Many courts have allowed juries to determine the propriety of document destruction after the institution of litigation even though the party destroying the documents denies any wrongdoing. The destruction of documents after the filing of a lawsuit can have disastrous consequences for the employer. Franklin v. Howard Brown Health Ctr., No. 17-cv-8376, 2018 WL 4784668 (N.D. Ill. Oct. 4, 2018); EPAC Techs. v. HarperCollins Christian Publ'g, No. 3:12-cv-00463, 2018 WL 1542040 (M.D. Tenn. Mar. 29, 2018), aff'd as modified, 2018 WL 3322305 (M.D. Tenn. May 14, 2018).

A.    Actual Malice Means a Deliberate Lie

The Supreme Court's choice of the term "actual malice" to describe subjective knowledge of falsity was unfortunate. Constitutional actual malice has nothing to do with spite, ill-will, or any of the other motives descriptive of common law "malice," which (also unfortunately) is sometimes referred to as actual malice. The term also does not include recklessness in the ordinary sense of gross negligence or an extreme departure from accepted standards. Constitutional malice is a purely subjective measure of what the defendant actually thought. See Reuber v. Food Chem. News, Inc., 925 F.2d 703, 714 (4th Cir. 1991) ("Actual malice is a subjective standard"). Accordingly, proof of negligence (e.g., failure to exercise care), spite/ill-will, or recklessness in the ordinary sense of gross negligence does not establish constitutional actual malice as a matter of law.

To establish actual malice, a plaintiff must show that a defamatory statement was made

"with knowledge that it was false or with reckless disregard of whether it was false or not." N.Y. Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964). Reckless disregard of whether a statement is false is different from the ordinary tort measure of recklessness, which is based on an objective standard. In the context of defamation, reckless disregard means that, "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication... [and] that the defendant actually had a high degree of awareness of probable falsity." Jordan v. Kollman, 269 Va. 569, 580 (2005) (internal citation omitted).

The Supreme Court's use of the words "malice" and "reckless" initially created confusion over the actual malice standard as they implied concepts of spite, ill-will, and gross negligence, which have nothing to do with a defendant's subjective belief about the accuracy of his statements. A person can despise the subject of his comments and intend to hurt that individual's reputation, but nevertheless believe what he is saying. Indeed, the Fourth Circuit has, at times, used the term "constitutional malice" instead of "actual malice" precisely because of the inherent confusion and utter irrelevance of common law malice in public official/public figure cases. See Ryan v. Brooks, 634 F.2d 726, 731 n.4 (4th Cir. 1980) ("We use this term to differentiate between the 'actual malice' defined in New York Times as the knowing or reckless publishing of a falsehood, and the 'actual malice' frequently required in other claims involving punitive damages and defined as malevolence, ill-will or spite. The latter is irrelevant in First Amendment cases, where the concern is to protect speech, however motivated, unless it is a calculated falsehood and therefore of no value to society."). Similarly, a person can make a statement without any investigation and nevertheless believe that what he or she is saying is true. These and related common misperceptions are discussed below.

B.    Common Law Malice is Not Proof of Actual Malice

Although sometimes mistakenly confused with common law malice, actual malice "has

nothing to do with bad motive or ill will." <u>Harte-Hanks Commc'ns, Inc. v. Connaughton</u>, 491

U.S. 657, 666 n.7 (1989). One court explained the distinction as follows:

> In the context of a libel suit, "actual malice" simply does not mean ill-will or
> spite. Rather, "malice" must be taken to mean fraudulent, knowing, publication
> of a falsehood, or reckless disregard of falsity. And we also note that reckless
> does not mean grossly negligent, its common use, but rather intentional
> disregard. When the Supreme Court uses a word, it means what the Court
> wants it to mean. "Actual malice" is now a term of art having nothing to do
> with actual malice.

<u>Reliance Ins. Co. v. Barron's</u>, 442 F. Supp. 1341, 1349-50 (S.D.N.Y. 1977); <u>see also</u> <u>Reuber v.

Food Chem. News, Inc.</u>, 925 F.2d 703, 715 (4th Cir. 1991) ("Even if Cooper harbored ill will

towards Reuber, and there is no evidence of that, the Supreme Court consistently has held that

'the actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the

ordinary sense of the term.'"); <u>Church of Scientology Int'l v. Daniels</u>, 992 F.2d 1329, 1335 (4th

Cir. 1993); <u>Jackson v. Hartig</u>, 274 Va. 219, 231 (2007).

    C.    Recklessness Does Not Mean Gross Negligence

    Plaintiffs frequently argue that recklessness in a defamation case should include gross

negligence or other objective measures of conduct. The law is clear, however, that for purposes

of proving actual malice, reckless conduct does not mean gross negligence, an extreme departure

from accepted standards, or any other objective measure of a defendant's conduct. The fact that

a reporter could have or should have uncovered additional facts has nothing to do with whether

the reporter believed what he was saying and does not amount to a "reckless disregard for the

truth" unless the reporter had "obvious reasons" to doubt the veracity of his statements.

    The United States Supreme Court explained this crucial distinction in reversing a

defamation verdict in <u>St. Amant v. Thompson</u>, 390 U.S. 727 (1968), where the defendant had

relied on a single source, whose reputation was unknown, without verifying the information:

1-1585133.2

> [R]eckless conduct is not measured by whether a reasonably prudent man would
> have published, *or would have investigated before publishing*. There must be
> sufficient evidence to permit the conclusion that the defendant *in fact* entertained
> serious doubts as to the truth of his publication. Publishing with such doubts
> shows reckless disregard for truth or falsity and demonstrates actual malice.

Id. at 731-32 (emphasis added); see also Gertz v. Robert Welch, Inc., 418 U.S. 323, 332 (1974)

("[M]ere proof of failure to investigate, without more, cannot establish reckless disregard for the

truth.").

The Fourth Circuit has frequently applied St. Amant to reject the argument that a failure

to investigate or to confirm demonstrates recklessness. In Ryan v. Brooks, 634 F.2d 726 (4th

Cir. 1980), for example, the court analyzed St. Amant at length in holding that proof of a failure

to investigate and confirm did not establish actual malice as a matter of law:

> In St. Amant v. Thompson, 390 U.S. 727, 88 S. Ct. 1323, 20 L. Ed. 2d 262
> (1968), the Court stressed the stringent evidentiary standard necessary to prove
> reckless conduct. In that case Thompson, a deputy sheriff, sued St. Amant, a
> candidate for public office, for defamation of the sheriff in a televised speech, in
> which St. Amant had quoted another person's statement that Thompson had taken
> bribes. The Louisiana Supreme Court had upheld the jury verdict for the plaintiff,
> finding sufficient evidence of reckless conduct under the New York Times
> standard. The record revealed that St. Amant had no personal knowledge of
> Thompson's activities, but relied solely on a source whose reputation he did not
> know; and he had failed to verify the information with those who might have
> known the facts. Nevertheless, the United States Supreme Court reversed,
> holding that these facts failed to prove St. Amant's reckless disregard for the
> accuracy of his statements. After reviewing the Court's previous decisions in the
> area of libel, Justice White wrote for the Court:
>
> These cases are clear that reckless conduct is not measured by whether a
> reasonably prudent man would have published, or would have investigated before
> publishing. There must be sufficient evidence to permit the conclusion that the
> defendant in fact entertained serious doubts as to the truth of his publication.
> Publishing with such doubts shows reckless disregard for truth or falsity and
> demonstrates actual malice.
>
> 390 U.S. at 731, 88 S. Ct. at 1325. Justice White then noted some examples of
> reckless conduct that would indicate bad faith publication and negate the New
> York Times privilege. They included publication of a completely fabricated story,
> or of one based entirely on an unverified anonymous telephone call; or publication
> where there are obvious reasons to doubt the veracity of the informant. Id. at 732,

88 S. Ct. at 1326. St. Amant's mere failure to investigate, however, did not prove
bad faith since there was no evidence that he was aware of the probable falsity of
the statements about Thompson. Id. at 732-33, 88 S. Ct. at 1326.

Id. at 732.  Recognizing that actual malice "contemplate[s] much more than a failure to exercise

ordinary care in verifying statements about public officials," id., the Court found insufficient

evidence of actual malice even though "better journalistic practice" would have called for

additional confirmation and the defendant had plenty of time to investigate further:

> Clearly it would have been better journalistic practice to have verified the
> accuracy of these secondary sources by reading the original account in the
> *Charlotte Observer*. But we cannot say that the failure to do so amounted to more
> than mere negligence. We recognize that the book was not "hot news," and a
> more thorough investigation should be expected in these circumstances than in the
> preparation of a news story under deadline pressure. Nevertheless, the sentence
> was such a small part of the whole work that the author might understandably feel
> three sources to be sufficient. Certainly where there was no reason to doubt the
> accuracy of the sources used, the failure to investigate further, even if time was
> available, cannot amount to reckless conduct.

Id. at 733.

In Hatfill v. New York Times Co., 532 F.3d 312 (4th Cir. 2008), the Fourth Circuit

affirmed the dismissal of a defamation case on summary judgment, again finding insufficient

evidence of actual malice.  The plaintiff in Hatfill based his claim on a series of columns

suggesting he might have mailed anthrax-laced packages to various government offices shortly

after 9/11.  Despite the fact the reporter did not know who was responsible and clearly suggested

it could have been the plaintiff, the court affirmed the dismissal based on the plaintiff's inability

to present clear and convincing evidence of actual malice.  In reaching its decision, the court

emphasized the subjective nature of the inquiry and that failing to investigate or confirm does not

establish recklessness, stating, "[u]nder this standard, it is not enough for a plaintiff to prove

simply that the defendant failed to investigate or to check the accuracy of a false statement.

Gertz, 418 U.S. at 332, 334-35 n.6.  The standard requires that the defendant have a 'subjective

awareness of probable falsity' of the publication." Id. at 317. Citing St. Amant, the court also

confirmed the extremely limited circumstances in which clear and convincing proof of actual

malice exists, noting, "[c]onstitutional malice requires 'much more than a failure to exercise

ordinary care' — it demands evidence of the 'publication of a *completely* fabricated story, or of

one based entirely on an unverified anonymous telephone call; or publication where there are

obvious reasons to doubt the veracity of the informant.'" Id. at 325 (emphasis in original).

The Fourth Circuit similarly affirmed a summary judgment on actual malice grounds in

Carr v. Forbes, Inc., 259 F.3d 273 (4th Cir. 2001), a defamation action based on an article that

appeared in *Forbes* magazine, stating:

> Carr essentially complains that Forbes should have investigated further before it
> published "Moonshine Bonds." According to Carr, "accepted standards of
> journalism" require this. Carr contends that, if these standards had been followed,
> Forbes would have learned that the article was altogether false. This may be true.
> However, "reckless conduct is not measured by whether a reasonably prudent
> man would have published, or would have investigated before publishing." St.
> Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)."
> There must be sufficient evidence to permit the conclusion that the defendant *in
> fact* entertained serious doubts as to the truth of his publication." Id. (emphasis in
> original).

Id. at 283. Despite acknowledging the lack of proof to justify the statements in the article, the

Court affirmed the dismissal, noting the important balancing embodied in the actual malice

standard and the need to protect free speech in a democracy:

> The Forbes article may contain false or misleading statements about Carr. The
> record before us certainly does not prove that Carr is a con-man or a criminal who
> enriched himself by defrauding bondholders in public-private partnership deals.
> He well may be an honest businessman who made some mistakes that those
> seeking to destroy his projects exploited. However, the First Amendment does not
> require perfection from the news media. Were the press subject to suit every time
> it erred, it would decline to speak out without resorting to the sort of cumbersome
> due diligence common in security offerings. For this reason, the Constitution
> provides the press with a shield whereby it may be wrong when commenting on
> acts of a public figure, as long as it is not intentionally or recklessly so.

Id.

I-1585133.2

In Reuber v. Food Chemical News, Inc., 925 F.2d 703 (4th Cir. 1991), the Fourth Circuit

reversed a defamation verdict and entered judgment for the defendant based on the lack of actual

malice. In Reuber, a publication focusing on the chemical industry reported on an internal

reprimand letter that criticized a scientist. Despite the fact that the source for the letter had an

interest in making the scientist look bad, the publication had a profit motive, and the reporter

*consciously decided not to inquire about the accuracy of the claims* in the letter, the Fourth

Circuit held that the plaintiff had failed to prove actual malice by clear and convincing evidence:

> Moreover, it is hardly unusual for publications to print matter that will please their
> subscribers; many publications set out to portray a particular viewpoint or even to
> advance a partisan cause. Defamation judgments do not exist to police their
> objectivity; the First Amendment presupposes that a veritable medley of opposing
> voices is better suited to the search for truth. See, e.g., New York Times v.
> Sullivan, 376 U.S. at 270, 84 S. Ct. at 720 (citing United States v. Associated
> Press, 52 F. Supp. 362, 372 (S.D. N.Y. 1943)).

> Reuber also contends that Cooper's attitude toward the accuracy of the allegations
> contained in the reprimand letter reveals her reckless disregard of the truth. For
> example, the trial court observed that Cooper testified that she made a conscious
> decision not to inquire into the truth or falsity of Hanna's allegations in the letter.
> Even if Cooper made such a decision, that decision does not prove actual malice
> under these circumstances. In St. Amant v. Thompson, 390 U.S. 727, 88 S. Ct.
> 1323, 20 L. Ed. 2d 262 (1968), a lower court listed as part of its rationale for
> finding actual malice that a political candidate had no personal knowledge of the
> activities of the public official he allegedly defamed during a television broadcast.
> Id. at 730, 88 S. Ct. at 1325. Instead, the candidate relied solely on the affidavit
> of a union member whose reputation for veracity the candidate did not know. In
> addition, he failed to verify the information with those in the union office who
> might have known the facts. Id. The Supreme Court held that this evidence,
> evidence remarkably similar to that relied on by the trial court in the present case,
> did not prove reckless disregard. Id. The Court noted that no evidence existed
> indicating that the candidate was aware of the probable falsity of the union
> member's statements or had reason to doubt his source's veracity. "Failure to
> investigate," the Court emphasized, "does not in itself establish bad faith." Id. at
> 733, 88 S. Ct. at 1326.

Id. at 716. In reversing the lower court, the Fourth Circuit held that the trial court had erred by

giving the jury an instruction that confused the subjective actual malice standard with an

objective standard based on journalism norms. See id. at 711-12 (noting the trial court's error in

basing an instruction on "the professional standards rule," and determining that reversal was necessary solely on the basis that the jury might have "rested its finding of actual malice on the impermissible ground of a departure from accepted standards").

In Church of Scientology International v. Daniels, 992 F.2d 1329 (4th Cir. 1993), the court applied the same principles in affirming summary judgment in an actual malice case involving statements about the Church of Scientology. Again, the court rejected the argument that defamation liability could be based on ordinary concepts of recklessness:

> "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant, 390 U.S. at 731, 88 S. Ct. at 1325-26 (1968). In Reuber v. Food Chemical News, Inc., 925 F.2d 703 (4th Cir. 1991) (en banc), we thoroughly discussed the standard of reckless disregard for the truth, and stressed the Harte-Hanks requirement that the plaintiff must show that the defendant acted with a high degree of awareness of probable falsity. Reuber made it clear that actual malice cannot be established merely by showing a departure from accepted journalistic or professional practices. The case emphasized that the failure to investigate, "where there was no reason to doubt the accuracy of the sources used . . . cannot amount to reckless conduct." Id. at 716.

Id. at 1334.

The Supreme Court of Virginia likewise has repeatedly held that a failure to investigate or confirm does not establish actual malice where the reporter did not have "obvious reasons" to doubt the veracity of the report. For example, in Jackson v. Hartig, 274 Va. 219 (2007), the court affirmed summary judgment in favor of a newspaper on a defamation claim brought by a public figure. The plaintiff in Jackson had lost an election to City Council and alleged that, prior to the election, the newspaper had printed a false editorial that asserted that the plaintiff had resigned from the school board amid a budget scandal. It was uncontroverted that, rather than resign, the plaintiff faced criminal charges and prevailed after a jury trial. The plaintiff also alleged that the editor made a comment to the effect that Jackson would have to "pay" for his

18

role in allowing the Virginia Beach School Board to run deficits while Jackson was a member.

Id. at 231. Jackson also submitted evidence suggesting that a thorough investigation would have revealed that the publisher's statement was false and that the very same newspaper had previously published stories that directly contradicted the editorial. Id. at 229. Despite this evidence, the Supreme Court of Virginia affirmed the summary judgment:

> Furthermore, a media defendant in a defamation claim subject to the New York Times standard cannot be said to have acted with actual malice on account of its failure to investigate the accuracy of an allegedly defamatory statement before publishing it unless the defendant first "had a high degree of awareness of [its] probable falsity." Shenandoah Publ'g House, Inc. v. Gunter, 245 Va. 320, 324, 427 S.E.2d 370, 372 (1993); see also St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) ("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication."). Thus, in the context of the actual malice inquiry, a duty to investigate the accuracy of one's statements does not arise until the publisher of those statements has a high degree of subjective awareness of their probable falsity. See Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 688, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (citing Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)).

Id. at 229-30. Looking at the totality of the evidence, the court found no "fact that would permit a reasonable fact finder to conclude that the defendants published [the statements in issue] either with actual knowledge of falsity or subjective serious doubts as to truth . . . ." Id. at 232; see also Jordan v. Kollman, 269 Va. 569, 580-81 (2005) (reversing a defamation verdict and entering judgment where there was insufficient evidence that the plaintiff "fabricated" false advertisements, that the advertisements were the "product of his imagination" or that there were obvious reasons to doubt the veracity of the information in the advertisements); Shenandoah Publ'g House, Inc. v. Gunter, 245 Va. 320, 324 (1993) ("A 'reckless disregard' for the truth . . . requires more than a departure from reasonably prudent conduct." ... Instead, the evidence must establish that the defendant had a high degree of awareness of probable falsity. Unless the

defendant had such an awareness, its failure to investigate before publishing is not sufficient to

establish a reckless disregard for the truth.") (citations omitted).  Courts throughout the country

have rejected similar arguments based on alleged "willful blindness."[2]

## V.   ACTUAL MALICE REQUIRES CLEAR AND CONVINCING PROOF THAT THE COURT MUST REVIEW INDEPENDENTLY

The actual malice standard, which requires proof by clear and convincing evidence,

---

[2] See, e.g., Don King Prods., Inc. v. Walt Disney Co., 40 So. 3d 40 (Fla. Dist. Ct. App. 2010) (affirming summary judgment despite the fact that plaintiff offered evidence of ill will and a failure to investigate); OAO Alfa Bank v. Ctr. for Pub. Integrity, 387 F. Supp. 2d 20 (D.D.C. 2005) ("Hence, the standard of actual malice 'is not satisfied even by proof of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.'"); Chafoulias v. Peterson, 668 N.W.2d 642, 655 (Minn. 2003) (affirming summary judgment in favor of a media defendant despite the plaintiff's evidence that the defendant's report was slanted against him and that the defendant did not adequately investigate the credibility of an attorney whose false statement the defendant aired in its program); Perk v. Reader's Digest Ass'n, Inc., 931 F. 2d 408, 412 (6th Cir. 1991) ("After an independent examination of the record, therefore, this Court concludes that the District Court's holding that Perk could not prove reckless disregard was correct.  Although the article portrays the appellant in a negative manner, appellees have no legal obligation to present a balanced view of what led up to Cleveland's default.  Nor are they liable for failing to perform the thorough professional investigation Perk would have preferred.  The appellant has not presented 'sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'"); Buendorf v. Nat'l Pub. Radio, Inc., 822 F. Supp. 6 (D.D.C. 1993) ("In spite of plaintiff's misinterpretation of New York Times Co. v. Sullivan, the rule is clear: failure to investigate thoroughly before publication, does not rise to the level of reckless disregard."); Fletcher v. San Jose Mercury News, 216 Cal. App. 3d 172, 189 (1989) ("In sum, we conclude the evidence of actual malice is neither clear nor convincing. Perhaps Herhold did not like Fletcher.  After hearing Fulcher's comments, this opinion is hardly surprising.  And perhaps the Mercury News articles were less than objective.  Clearly the articles contained factual errors.  But was there clear and convincing evidence that Herhold did not believe his story was true?  We do not think so."); Saenz v. Playboy Enters., Inc., 653 F. Supp. 552, 572 (N.D. Ill. 1987) ("[F]or purposes of constitutional malice, Playboy's editors were under no obligation to check Morris' facts at all, unless something blatant put them on notice that he was reckless about the truth."), aff'd, 841 F.2d 1309 (7th Cir. 1988); Tavoulareas v. Piro, 817 F.2d 762 (D.C. Cir. 1987) (affirming the district court's entry of judgment notwithstanding the verdict despite the plaintiff's evidence that the publisher relied on a single source who harbored personal animus toward the plaintiff); Murray v. Bailey, 613 F. Supp. 1276, 1280 (N.D. Cal. 1985) ("A publisher's failure to make an independent investigation of a story, even when the publisher is aware of the possible bias of its source, does not amount to reckless disregard in the absence of serious doubts about the story's truthfulness."); Doubleday & Co. v. Rogers, 674 S.W.2d 751, 756 (Tex. 1984) ("[P]roof of an utter failure to investigate amounted to no evidence of malice.").

I-1585133.2

imposes an extraordinarily high burden on a defamation plaintiff.  See, e.g., CACI Premier

Tech., Inc. v. Rhodes, 536 F.3d 280, 293 (4th Cir. 2008) ("As we have said, '[e]stablishing

actual malice is no easy task, because the defamation plaintiff bears the burden of proof by clear

and convincing evidence.'"); Church of Scientology Int'l v. Daniels, 992 F.2d 1329, 1334 (4th

Cir. 1993) ("However, a public figure plaintiff faces a significant burden in proving actual

malice.  The Supreme Court has made it clear that a 'defendant must have made the false

publication with a high degree of awareness of . . . probable falsity.'").

    Moreover, in any case that proceeds to trial, both the trial court and the appellate court

must independently review a plaintiff's evidence to ensure that it satisfies the stringent test for

clear and convincing proof of actual malice.  See Ryan v. Brooks, 634 F.2d 726, 735 (4th Cir.

1980).  In Bose Corp. v. Consumers Union of the United States, Inc., 466 U.S. 485 (1984), the

Supreme Court confirmed that federal appeals courts hearing defamation or libel cases must

conduct an "independent appellate review" to determine whether the evidence proves actual

malice under New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964).  In Bose, the

Supreme Court confirmed that the independent appellate review discussed in New York Times v.

Sullivan, was a rule of federal constitutional law that "reflects a deeply held conviction that

judges – and particularly members of this court – must exercise such review in order to preserve

the precious liberties established and ordained by the Constitution."

    In making this review, the reviewing court departs "from the considerable deference an

appellate court normally accords to a fact-finder's determinations." Reuber v. Food Chem.

News, Inc., 925 F.2d 703, 714 (4th Cir. 1991).  As the Fourth Circuit has explained, "[b]oth the

independent review requirement and the heightened evidentiary standard reflect the importance

associated with defamation judgments.  This importance stems from the crippling effect the

I-1585133.2

casual award of defamation damages can have upon the freedom of the press and, indeed, upon

the 'free exchange of ideas' generally." Id. at 715 (citing Harte-Hanks Commc'ns, Inc. v.

Connaughton, 491 U.S. 657 (1989)).  Given this high burden and the important interests at stake,

"granting of summary judgment is especially appropriate in libel cases, for prolonging a

meritless case through trial could result in further chilling of First Amendment rights."

Anderson v. Stanco Sports Library, Inc., 542 F.2d 638, 641 (4th Cir. 1976).

## CONCLUSION

Ms. Ortiz is in no way responsible for the Facebook Messenger messages between

Mr. Thomas and Ms. Scott.  Ms. Ortiz's text message to her superior is privileged under the

common interest privilege and there is no clear and convincing evidence that Ms. Ortiz had any

improper motive in making the statement.  This action may proceed only if the Plaintiff presents

clear and convincing evidence of actual malice, and there is no such evidence.  In light of the fact

Ms. Ortiz did not know what was being shred on March 2, there is no way such evidence could

be developed.  Summary judgment should be granted to Ms. Ortiz.

Dated:  February 20, 2019                    Respectfully submitted,

                                             /s/
                                             _____
                                             Conrad M. Shumadine
                                             (VSB No. 4325)
                                             Counsel for Peninsula Airport Commission
                                             Newport News/Williamsburg International Airport,
                                             Sharon P. Scott, E. Renee Ford, Lisa M. Ortiz, and
                                             Wilmer K. Thomas, Jr.
                                             WILLCOX & SAVAGE, P.C.
                                             440 Monticello Avenue, Suite 2200
                                             Norfolk, Virginia 23510
                                             757.628.5500 Telephone
                                             757.628.5566 Facsimile
                                             cshumadine@wilsav.com

I-1585133.2

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of February, 2019, I sent a true and correct copy of the foregoing to the following via electronic transmission to the following:

David L. Littel (VSB No. 37690)
Kellam T. Parks (VSB No. 45735)
Meghan M. Casey (VSB No.86771)
Counsel for Plaintiff
Parks Zeigler, PLLC
4768 Euclid Road, Ste. 103
Virginia Beach, Virginia 23462-3810
757.453.7744 Telephone
757.453.7578 Facsimile
dlittel@pzlaw.com
kparks@pzlaw.com
mcasey@pzlaw.com
khayes@pzlaw.com

                                        /s/
                                        Conrad M. Shumadine
                                        (VSB No. 4325)
                                        Counsel for Peninsula Airport Commission
                                        Newport News/Williamsburg International Airport,
                                        Sharon P. Scott, E. Renee Ford, Lisa M. Ortiz, and
                                        Wilmer K. Thomas, Jr.
                                        WILLCOX & SAVAGE, P.C.
                                        440 Monticello Avenue, Suite 2200
                                        Norfolk, Virginia 23510
                                        757.628.5500 Telephone
                                        757.628.5566 Facsimile
                                        cshumadine@wilsav.com

I-1585133.2