IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

(Newport News Division)

KEN SPIRITO,

      Plaintiff,

v.                                             Case No. 4:18-cv-58

PENINSULA AIRPORT COMMISSION,

Etc., et al.,

      Defendants.

## MEMORANDUM IN OPPOSITION TO PENINSULA AIRPORT

## COMMISSION'S MOTION FOR SUMMARY JUDGMENT

### ARGUMENT IN BRIEF

Plaintiff opposes Defendant's Motion for Summary judgment on a number of grounds. First, there are numerous material issues of fact central to this case that are disputed. Defendant claims that a number of issues are undisputed that are in fact disputed. Many of these are detailed below. Furthermore, Defendant's presentation of the facts consists largely of selected testimony from its own employees /witnesses with no evidence that said facts are undisputed. In many cases Defendant's recitation of the facts does not set forth any references to the "facts" to which it calls the Court's attention as the basis of its Motion for Summary judgment. Defendant's presentation of the facts in its brief are more in the nature of a selective narrative based on its own assertions. This is manifestly insufficient to support a Motion for Summary Judgment.

Second, even if one were to take Defendant's asserted facts as true, which is not the standard in a Motion for Summary Judgment, they do not resolve the questions that are the material

elements of a claim of defamation. They do not establish that actual malice, or common law malice, were present or not. The totality of the facts asserted by Defendant in this Motion simply do not rise to the level of conclusively establishing the facts in its favor.

Third, Defendant's claim that Plaintiff cannot establish actual malice fundamentally misconstrues the law on actual malice as applied to the facts of this case.

Fourth, Defendant's argument based on privilege does not account for the factors that can overcome that privilege. The privilege asserted is a qualified privilege under Virginia law and it can be overcome by a finding of abuse of privilege, which can be found by the finder of fact under the facts. Furthermore, the question of whether the privilege was abused is a jury question, and the standard of abuse is necessarily met if actual malice is proven. Therefore, the question of whether an applicable privilege was abused is subject to the same analysis as actual malice, and Plaintiff contends that he can manifestly meet this burden based on facts adduced in this matter to date.

Fifth, Defendant's argument that it cannot be responsible for the Facebook messages originated by Wilmer Thomas is not supportable. For reasons that will be detailed, the actions of other PAC employees and agents in transmitting these messages are within the scope of their employment with the PAC and can establish the PAC's vicarious liability for Thomas's actions.

<u>STANDARD OF REVIEW</u>

To prevail on a Motion for Summary judgment under Federal Rule of Civil Procedure 56(c), the moving party must demonstrate, based on the pleadings, the discovery, the disclosure materials on file and affidavits, that the is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); <u>Celotex Corp v. Catrett</u>, 477 U.S. 317, 327 (1986).  In considering a Motion for Summary Judgment, the court views the underlying facts and all reasonable inferences drawn therefrom in the light most favorable to the

non-moving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). The Court does not weigh the evidence or determine the truth of the matter when considering a Motion for Summary judgment. Instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 255 (1986).

<u>FACTS</u>

This is a case of defamation arising from certain messages alleging that Plaintiff was shredding documents with an implied allegation that he was doing so in order to hide documents related to a government audit. Plaintiff alleges that the messages at issue were originated, published and republished by employees and agents of the Peninsula Airport Commission. As a result, the messages were ultimately displayed in a front-page article of the Daily Press superimposed over pictures of evidentiary materials. The implication of criminal shredding of evidence was unmistakable. Plaintiff's personal and professional life has been catastrophically impacted as a result of the allegations originating at the Peninsula Airport.

Plaintiff has taken thirteen depositions in this case. All but one of the deponents are PAC personnel. They include four current employees that work in the PAC office, three former employees that were employed at the PAC at the time of the events in question, and four PAC commissioners. Plaintiff has also taken the Rule 30(b)(6) deposition of the organizational representative of the airport.

There has been no dispute in the testimony about the basic sequence of events. The controversy relating to the People Express loan led to an audit. The audit was performed by the Virginia Department of Transportation ("VDOT"), beginning on January 27, 2017 and continuing through the middle of May 2017. On March 2, 2017, Spirito shredded some documents at the

office shredder at around 8:15 to 8:30 AM. (Spirito Depo. 13:1-3; 34:13-15; 39:17- 40:3; 74:10-13; Ortiz Depo. 25: 15- 25; 27: 5-16; Wissinger Depo. 23: 3-5; 23:25- 25:7) Lisa Ortiz heard the shredding and sent the first text message to Renée Ford.  (Ortiz Depo. 22:22- 23:10) The March 2nd text message exchange as set forth in the Complaint was confirmed:

> Ortiz:  *"Wow Ken is shredding shredding shredding."*
>
> Ford:  *"Unbelievable"*
>
> Ortiz:  *"Seems kinda weird"*
>
> Ford:  *"This is getting out of hand!"*

Ford called PAC Board member Steve Mallon later on March 2nd to inform him of what she had heard from Lisa Ortiz about shredding documents. (Ford Depo. 56:13-57:10; Mallon Depo. 58: 5-19) Mallon told Ford to contact PAC Board member Rob Coleman. (Ford Depo. 57:7-10; 58: 18-21; Mallon Depo. 58:15-19) Coleman called the state police to report the shredding without doing any investigation or asking any PAC employee (or Spirito) anything about it. (Coleman Depo. 17: 8- 28:8) There was a special meeting of the Board on March 2, 2017. The notice for the meeting indicated that one of the issues to be discussed was personnel. Ford's perception of the purpose for the meeting was that either her or Spirito's employment was at issue. (Ford Depo. 38:12- 39:6) The issue of shredding documents was discussed by the PAC Board members at the March 2nd meeting. There was conflicting testimony among Board members on what was discussed. (Coleman Depo. 21:20- 22:4; 29:7- 32:7; Scott Depo 16:7-19; 21:4-12; 40:14-21; Mallon Depo. 64:3- 66:2; Wallace Depo 15:22-16:5; 18:20-19:1; 23:11-26:15) At the same meeting the Board voted to place Plaintiff on administrative leave.

The text messages were subsequently presented to the VDOT auditors during audit interviews of Ford and Scott. The text messages about shredding appeared in the VDOT report

and were subsequently published on the front page of the Daily Press and were widely publicized. The PAC Board formally terminated Spirito as Executive Director on May 15, 2017.

On the material circumstantial facts most central to Plaintiff's claim of defamation, virtually all of the facts were corroborated by the PAC witnesses that were deposed.

Rhonda Wissinger was Plaintiff's administrative assistant at the time of the events in question and had worked with Plaintiff as her direct supervisor for nine years. She was an eyewitness to the actual shredding at issue that occurred on March 2, 2017 in the PAC office. She confirmed that her desk was located very close to the shredder and copier machines and that she could normally see everything that was happening if someone was using the shredding machine. (Wissinger Depo 12:25-13:6; 18:5-12) This was the case throughout the years that she worked in the PAC office as an employee of the PAC.

Wissinger confirmed unequivocally that Spirito routinely shredded documents himself during the nine years that she worked with him, (Wissinger Depo. 16:21-17:3) that there was no change in the office policy regarding shredding or document retention during the audit, (Wissinger Depo. 18:13-20:16) and that office staff including Ford and Ortiz continued to use the shredder routinely during the audit (Wissinger Depo. 20:3-22). She further testified that there was nothing out of the ordinary about Spirito's shredding on the morning in question. (Wissinger Depo. 25:11-24) She testified that Spirito was using the shredder at around 8:15 to 8:30 in the morning and that there was nothing unusual about this. (Wissinger Depo. 25:21-26:3) Regarding her direct observations of the event on the morning of March 2nd, she testified:

**Q.     All right. So just go ahead if you would and walk through what you saw that morning as far as anything relating to Mr. Spirito shredding something.**

A.      Okay. So a few minutes after I got there he came over to my desk and the way my desk was, of course it shows where it's facing the shredder, the one side of my desk, a lot of people, a lot of stuff in the department would put their things on my desk there if they're making copies of shredding. And so there were old airline presentations that had been bound together with a spiral binding, which I normally put those together for him.

So we would use a binding machine and the spiral binding to attach them. So he was undoing the spiral binding to shred those documents. And I would say he probably had anywhere from like five to eight of them and they were, he had them kind of spread out across my desk and was unbinding each one before he'd shred them.

**Q.      Okay. And did you see him shred anything other than those things?**

A.      No.

**Q. And this was on your desk that he had set these things. Is that right?**

A. Yes, that's correct. (Wissinger Depo. 23:25-24:24)

This is the testimony of the only independent eyewitness to the events in question and it is consistent with Plaintiff's factual account of what occurred that morning.

Wissinger testified further that she was never asked about her observations of the shredding incident by anyone from VDOT or by anyone at the PAC up until the date of her deposition in December 2018. (Wissinger Depo. 27:12-29:3) This includes the time before Spirito was placed on leave, the several weeks after he was on leave but before he was terminated and after his termination and through the first few of months of this litigation — even months after written discovery on this question had been propounded to the PAC and the other Defendants in this action. After the shredding issue had been sensationalized on the front page of the newspaper and became the subject of the VDOT report and subsequent commentary, no one from the PAC, no one from

the VDOT audit team, no PAC Commissioner and no one else ever asked her about her observations even though she directly observed the event and her desk faced the shredder and was only a few feet away.

Ortiz also confirmed in her testimony that Spirito shredded documents himself during the nine years that she worked with him, (Ortiz Depo 14:24-15:10) that there was no change in the office policy regarding shredding or document retention during the audit, that office staff including herself and  Ford continued to use the shredder routinely during the audit (Ortiz Depo 20:9-21:10).

Ortiz's account of what she observed on the Morning of March 2nd was as follows:

**Q.      Did you hear the shredder first or did you see it first? Did you see the shredding happening?**

A. I think I heard it first.

**Q. And you're saying you walked out of your office to make a copy of something?**

A. Yes.

**Q. So you walked up to the copy machine?**

A. Yes.

**Q. And Mr. Spirito was standing there?**

A. Yes.

**Q. And he was shredding things.**

A. Yes.

**Q. Did you see what he was shredding?**

A. No.

**Q. Did you look to try to get any idea of what it was?**

A. I made my copy and walked away.

**Q. Did you say anything to him?**

A. No, I did not.

**Q. He didn't stop shredding or anything when you walked up, did he?**

A. I do not recall. (Ortiz Depo. 27:5- 28:1)

In an extremely significant exchange during Ortiz's deposition, she testified that Ford asked her if she could pass Ortiz's text messages on to the VDOT auditors before she was asked to do so at her VDOT interview. This is significant because at this time Defendants are taking the position that Ford only passed the messages on to the auditors "reluctantly" when she was asked to do so. Please see the discussion in Ortiz's deposition transcript (too lengthy to duplicate here) at page 39, line 13 through page 42, line 17. Part of Ortiz's relevant testimony on this point was:

**Q.      So have you spoken with anybody else about this? Let me ask about Renee Ford after March 2nd. Have you ever spoken to Renee Ford about this shredding question or these text messages?**

A. I think she asked me if she could tell the auditors and I gave her my okay. I must have.

**Q. Okay. Was that in an email or a text message that she asked you?**

A. No, we don't typically text, like I said. Yes, that would have been in person at work.

**Q. So she asked you if she could tell the auditors what exactly?**

A. I don't recall. I mean, pass this on to them.

**Q. Pass the text message on?**

A. Yes.

**Q. When was that conversation?**

A. I do not recall.

**Q. But it was before she actually passed the messages on to the auditors, to your knowledge? Because she was asking you if it was okay to do that, right?**

A. Yes. (Ortiz Depo. 39:13- 40:11)

Ortiz also testified that no one at the PAC ever asked her about her observations relating to the March 2, 2017 shredding incident. (Ortiz Depo 44:4-7.)

Ford confirmed in her testimony that Spirito shredded documents himself during the nine years that she worked with him, (Ford Depo 44:1-45:6) that there was no change in the office policy regarding shredding or document retention when the audit began or at any time during the audit, (Ford Depo. 46:9-49:15) and that office staff continued to use the shredder routinely during the audit (Ford Depo. 49:8-15; 50:15-21).

Ford's personnel records and evaluations from the PAC have been disclosed in discovery and they substantiate that she received poor ratings for a number of years. These evaluations are attached hereto as Exhibit A. Her last rating, given to her by Spirito in July 2016, contains virtually all ratings of "1" and "2" on a 5-point scale, indicating that the vast majority of categories were either "unacceptable" or "needs improvement." This was Ford's last employee evaluation by Spirito before the material events occurring in late 2016 and early 2017 as detailed below. Significantly, the fact of Ford's poor performance was corroborated by a number of her coworkers at the PAC and they gave testimony to this effect even though they are still working with or under Ford. Lisa Ortiz testified that Ford had ups and downs and that there were issues with Ford not holding required meetings (Ortiz Depo. 51:15- 53:7) Rowena Byrd testified that she had to talk with Spirito about Ford not being present and that others in the office said Ford was absent more than necessary. (Byrd Depo. 15:10-17:18)

When asked about perceptions and complaints about Ford's work performance at the PAC office, Wharton testified that Ford's staff grumbled and complained that Ford was not available when they needed her, particularly Ortiz and Byrd; that Lisa Ortiz "complained all the time about it;" that Rowena Byrd also "complained about it all the time" and further that "Rowena on more occasions than I can count said 'I'm so sorry I recommended Renée for this job.'" (Wharton Depo. 12:25-14:5; 49:25- 51:10)

In January 2017 Ford approached Commissioner Steve Mallon at a PAC retreat in Williamsburg (Ford Depo. 16:8-15) She discussed various complaints she had about Spirito.  The subjects of her complaints ranged from various issues about the taxability of benefits to her perception that Spirito's treatment of her created "an oppressive environment."  (Ford Depo. 22:17-19.) The issues and complaints made by Ford in this timeframe ended up appearing in Spirito's termination letter issued on May 15, 2017. Spirito's termination letter is attached hereto as exhibit D

Steve Mallon testified that he was friends with Tom McDermott since the mid to late 1980s; he attended parties with McDermott and had worked with McDermott in previous years. (Mallon Depo 18:10-20:5) Tom McDermott was the proprietor of the restaurant at the airport when the restaurant lease was terminated. Mallon agreed that McDermott was upset about the termination of his lease and when asked if McDermott "had it out for Spirito" he responded affirmatively. (Mallon Depo 27:21-28:1). Mallon acknowledged that he sided with McDermott with respect to the restaurant controversy. In fact, he was so sympathetic to McDermott's cause that he actually agreed to testify against the PAC in litigation related to the restaurant while he was a sitting PAC Commissioner. (Mallon Depo. 20:9-17)

Wilmer Thomas was a custodian at the airport for several years. Thomas testified in his deposition that McDermott was so enraged about the restaurant incident and his perception that it was Spirito's fault, that he was starting rumors and telling people that Spirito "had it coming." (Thomas Depo. 47: 2-23) Thomas's testimony on this point was:

**Q.   … But was Mr. McDermott talking to a lot of people about Ken Spirito and saying bad things about him?**

A.   I just heard a long time ago rumors that he said, and another, from him to go down to, I went to the restaurant.  I couldn't enjoy my meal because he'd come sit down and talk.

**Q.   Mr. McDermott?**

A.   McDermott.

**Q.   And what kind of things was he talking about?**

A.   He said rumor has it so we can get Ken.  I said, "Man, you need to leave him alone."

**Q.   When did that happen, that conversation?**

A.   That was way before, was before Christmas.

**Q.   Before this happened?  Before this text message?**

A.   Before all of this happened.  Way before it hit the paper.

**Q.   And he said, "We're going to have to get Ken somehow."**

A.   He said, "Ken got it coming." (Thomas Depo. 47:2-23)

Regarding Thomas's testimony on the Facebook messages that he sent to Scott, he testified that he was terminated in February 2017. He had never mentioned anything to anyone about shredding until approximately five weeks later when he was sitting at home and decided that his termination must've had something to do with shredding. (Thomas Depo. 27:17-28:21) He believed he recalled an incident of January 27 in which he saw Spirito and Wharton walking around

the corner from the shredder late in the afternoon or early in the evening. He said he heard the

shredder go off but did not know who had used it. Sitting in his home a month later contemplating

his termination, he decided it must've had something to do with that observation and he then sent

the text message to Scott stating "*I know about the shredding at the airport*." Scott transmitted this

and another Facebook message from Thomas to the VDOT auditors.

Michael Giardino, designated as the airport's representative for the purpose of a Rule

30(b)(6) deposition, testified that everyone had praise for Spirito before March 2, 2017. (Giardino

Depo. 48:9-10)

<u>PLAINTIFF DISPUTES THE PAC'S LIST OF "UNDISPUTED FACTS."</u>

In its supporting memorandum, the PAC lists a number of facts which it claims are

undisputed. Most of the listed claims are in fact disputed. Almost all of them have no reference to

any supporting facts or testimony in the record. Many of them are simply based on the assertions

of the PAC's own employees with no justification for the claim that the facts are undisputed. This

is in violation of rule 56(c)(1)(A), which expressly requires that the moving party in a Motion for

Summary Judgment must cite to "particular parts of materials in the record." Defendant is the

moving party and has the burden to properly support its contention that there are no material

disputed facts in this matter. Plaintiff objects to Defendant's Motion for Summary Judgment and

supporting memorandum on this basis and moves the court to deny the Motion for Summary

judgment on this ground.

Plaintiff will set forth reasons that Defendant's list of undisputed facts are in fact disputed.

In bold type below are Defendant's allegations of undisputed facts followed by analysis.

1. **The Plaintiff did shred documents early in the morning of Thursday, March 2, 2017, when a special commission meeting had been scheduled to take steps to respond to the VDOT auditors' document requests and to consider Mr. Spirito's employment.**

Plaintiff agrees that he shredded documents on the morning of March 2nd. Plaintiff does not agree that the meeting that day was called to consider his employment. Specifically, Plaintiff does not agree that he or Ortiz were aware of this fact at the time as it had not been publicized in any way to Plaintiff's knowledge. There is no reference to the record supporting this contention. The record does reflect that Spirito and Ford were not aware that his employment specifically was at issue for the March 2nd meeting on the morning of March 2. (Spirito Depo. 75:16-76:22; Ford Depo. 37:7-39:6; Ortiz Depo 34:1-13.)

2. **On Tuesday, February 28, 2017, the Chairman of the Commission George Wallace called a special commission meeting placing on the agenda compliance with the audit, the retention of counsel, and Mr. Spirito' s status. The notice was sent out February 28, 2017. A copy is attached as Exhibit A.**

Plaintiff does not dispute that a meeting notice was sent out. However, the notice does not say anything about "Mr. Spirito's status." Neither Plaintiff nor Ford or Ortiz knew that his status was at issue for the March 2nd meeting until just before the meeting, when Wharton received a phone call from the media asking whether Spirito was going to be fired that day. (Spirito Depo. 75:16-76:22; Ford Depo. 37:7-39:6; Ortiz Depo 34:1-13; Wharton Depo 26:11-25) Furthermore, the email attached to Defendant's memorandum as Exhibit A does *not* support the assertion.

3. **The VDOT auditors complained that documents were not being produced in spite of requests for those documents. Documents reflecting what the Commissioners had been advised as to documents being produced to the VDOT auditors are attached hereto as Exhibit B.**

This fact is disputed. The timeframe for this fact is not given and therefore the claim has no evidentiary meaning.

4. **The February 28, 2017 Daily Press article reported that Mr. Spirito and the Commission's then attorney were asked to leave the room at a February 27, 2017 special meeting. The Daily Press reported,**

> *The audit is likely to take longer than expected because the Commission is not providing documents investigators have requested, in some cases two or three times, and because Commission staff have not made themselves available, said Secretary of Transportation Aubrey Layne.*

It is not disputed that an article with this language was printed on the date given. However, its contents are hearsay and inadmissible. The truth of the assertions is absolutely disputed by the Plaintiff. In addition, there is no evidence that the relevant individuals read this particular statement or that they believed it to be true.

5. **On February 28, 2017, Commissioner Rob Coleman sent an email to Mr. Spirito reiterating that all documents be produced to the VDOT auditors. A copy is attached as Exhibit C.**

6. **The VDOT auditors were told the Commission had no due diligence documents.**

This assertion is false and there is no timeframe given. There is also no reference to the record to support this proposition.

7. **The VDOT auditors were not provided access to the emails they requested prior to March 2, 2017 in spite of repeated requests.**

This is disputed. The auditors were in fact given access to some emails before the February 28, 2017 article appeared in the Daily Press. Others were being gathered to be produced. Documents reflecting the parameters of the audit indicated that they wished to complete the audit within 60 days. Emails and other documents were produced on a schedule. When the Daily Press article appeared on February 28 with the quote from Aubrey Layne stating that documents were not being produced, the PAC's counsel immediately sent an email to Mr. Gales demanding to know what documents they claimed had not been provided. Mr. Gales responded with a list. (See Exhibit B to Defendant's supporting Memorandum) However, there is no evidence in the record that prior to the publication of Lane's statement in the newspaper, the auditors were not receiving documents as requested, that the audit was not proceeding on a reasonable schedule or that PAC personnel, including, Spirito, were being

uncooperative. This narrative of noncooperation with the audit has been fabricated after the fact to justify the actions of Defendants regarding the shredding allegations in this case.

    **8. Ms. Ortiz reported the shredding in a text message to her supervisor, Ms. Ford.**

    **9. Ms. Ford was not in the office at the time she received the text message, but Ms. Ford was aware of the VDOT auditors' complaints regarding the failure to produce documents, the lack of documents relating to due diligence, the failure to produce written/electronic communication relating to negotiations between People Express and the Commission, and the fact that a special commission meeting had been called to deal with these issues.**

All of this is disputed except for the fact that Ford was not in the office when the shredding occurred on March 2. Defendant does not provide citations to the record to support this list of facts.

    **10. Three people in the Commission's office heard the shredding on the morning of March 2, 2017 and each found it unusual. The three are Lisa Ortiz, Rowena Byrd and Jessica Minor.**

Contention is disputed and as worded, grossly misleading. These witnesses believed that the shredding was noteworthy because of the of length of time of the shredding. Byrd testified that the shredding that morning was "no big deal," (Byrd Depo 27:3; 29:4-5). Further, Wissinger observed shredding by Plaintiff on the date in question and testified that there was nothing unusual about Spirito's usage of the shredder that morning. (Wissinger Depo. 25:11-24.)

    **11. Ms. Ford reported the shredding to Commissioner Mallon and, upon his direction, to Commissioner Coleman. Commissioner Coleman was a Major in the Newport News Sheriff's Office as well as a Commissioner and had extensive experience with investigations.**

There is no evidence in the record that Commissioner Coleman was a Major in the Newport News Sheriff's Office or had extensive experience with investigations.

    **12. Commissioner Coleman decided to report the shredding to the Virginia State Police.**

    **13. The Commission made no investigation and took no action of any kind relating to Mr. Spirito 's shredding of documents.**

It is true that the Commission made no investigation. It is not true that the Commission took no action. According to the testimony of Mallon who was present at the March 2, 2017 Board

meeting, there was discussion of the shredding allegation; Chairman George Wallace authorized a report to the police and Coleman made that report. (Mallon Depo. 64:7-66:2) Plaintiff further contends that the Board ultimately terminated his employment in large part due to the shredding allegation.

14. **The possibility that Mr. Spirito might be shredding documents was raised early in the investigation to the VDOT auditors by Secretary Layne's office based on information received from TSA personnel. (Gales Dep. pages 33-38).**

15. **The VDOT auditors have confirmed that the shredding of documents was not raised to them by the Commission or any of the Commission's employees. (Gales Dep. page 44).**

This is disputed. Gales' recollections are not dispositive on this or any factual issue. In addition, Ortiz has testified that Ford raised this issue with the VDOT auditors prior to her interview and in fact requested Ortiz's permission to send the texts about shredding to them prior to her interview with the auditors. (Ortiz Depo. 39:13-42:5) This contradicts Ford's claim that she did not raise this with the auditors.

16. **It was the VDOT auditors who decided to place the information relating to document shredding in the audit report based on their investigation.**

17. **Neither the Commission nor any of the Defendants had anything to do with this decision by the state auditors.**

This is disputed. Ford's actions in selectively reporting Plaintiff's shredding to the auditors despite the fact that all employees in the office had been shredding during the audit was the direct and proximate cause of the text messages appearing in the VDOT report. Scott and Thomas's actions in this regard for the direct cause of the other text messages appearing in the VDOT report. Scott testified that she mentioned the Facebook messages to the auditors when asked whether they approached her with the information on her messages. Scott Depo 32: 13-25.

18. **The Daily Press had published 26 articles on the Commission between January 26, 2017 and March 2, 2017, and the vast majority of these articles were highly critical. Two of the articles highlighted the failure to provide documents as requested by the auditors. These articles were regularly collected by the Commission and were discussed throughout the office.**

As worded, this is disputed. There is no reference to which of the articles, if any, were specifically critical of the Plaintiff and there is no indication or reference to the record establishing that these particular articles were read or believed by any of the relevant individuals.

19. **The VDOT auditors determined that documents sent to or from Mr. Spirito found on servers outside of the Commission were not on the Commission's server. Among those missing documents was the February 26, 2017 email from Mr. Spirito to Ms. Wharton, Ms. Ford and Ms. Cheaney saying that the Commission's then-counsel intended to "push back" on the audit requests.**

This is disputed. Plaintiff routinely deleted emails from his desktop Outlook program as a matter of normal practice. He has done this throughout his career. Plaintiff has received a folder from Defendant's counsel of over 3000 documents alleged to have been "deleted" by Spirito. It is not clear from what these items were allegedly deleted and where they remained. The majority of the files in the folder are unreadable. It was Spirito's understanding that deleting items from his desktop would not from the PAC server. (Spirito Depo. 241:14-242:4). Furthermore, Plaintiff has no means of assessing whether this collection of documents is complete, how any such search was performed, whether the items provided were actually deleted by Spirito or whether there is any validity to the search whatsoever. This claim would have to be established through proper foundation through viable expert testimony and disclosure, none of which has been done. This claim is inadmissible.

20. **Wilmer Thomas was not an employee of the Commission when he sent the Facebook Messenger message that is the subject of this action to Ms. Scott.**
21. **Sharon Scott never shared the Facebook Messenger message from Wilmer Thomas with anyone until she was requested to provide it to the VDOT auditors.**

There is no reference to any supporting fact in the record. To the extent that this was Scott's testimony, this is far from conclusive and Plaintiff does not agree with the truth of Scott's testimony.

**22. All employees at the PAC were told by the Commission to cooperate fully with the auditors and to provide any information requested.**

This fact is disputed. There is no reference to the record. Moreover, employees had already been instructed to cooperate fully with the audit prior to the time of the Board's decision to place Spirito on leave.

ARGUMENT

I.    ACTUAL MALICE

The key elements supporting a finding of actual malice as set forth in the Complaint have been corroborated by the PAC's own employees. All of the PAC witnesses acknowledged that the shredding documents had continued normally when the PAC audit began and while it was going on. When Ford was asked directly whether she continued to shred documents as needed during the audit she responded simply "correct." All of the PAC employees also acknowledged that they were aware of Spirito using the shredder himself over the years while he served as executive director. Wissinger, whose desk was a few feet from the shredder, testified that Spirito routinely used the shredder himself.

All of the PAC witnesses acknowledged that there was no change in shredding or document retention policies after the audit commenced and that they and other personnel continued to shred documents routinely. When Ford was asked directly whether she continued to shred documents as needed during the audit she responded simply "correct." All of the PAC employees also acknowledged that they were aware of Spirito using the shredder himself over the years while he served as executive director.

The shredder was located centrally in the office and it made a loud noise that virtually everyone in the executive suite could hear, as corroborated by the testimony of

several witnesses who indicated that they heard the machine on the morning in question. The shredder was located in an open area of the office and it had been previously moved there at Spirito's direction. Spirito was standing at the shredder on the morning of March 2 at around 8:15 to 8:30 AM shredding documents as he normally did. He knew that others were present in the office because others normally came in before him. Ortiz testified that she actually walked out and stood beside him making a copy while he was shredding documents, but that Spirito did not stop shredding or altering his behavior while she observed him.

Under the circumstances it is bizarre and inexplicable that anyone would make an issue of the fact that Spirito was using the shredder that morning. Interestingly, Ortiz testified that when she first sent the text message, in her own mind it was like a "joke shock." (Ortiz Dep. 26:16-17). Byrd testified that she thought it was out of the ordinary that the shredder was being used for that length of time, but volunteered in her testimony that it was "no big deal" and added "like I said, we are a business office and people use shredders." (Byrd Dep. P.27:3-7). Minor also thought that the amount of shredding was somewhat out of the ordinary but did not comment further to anyone after that morning, indicating that she did not believe that the shredding was noteworthy for any reason other than the length of time.

Only one person at the office that day wanted to draw attention to and communicate to others Spirito's use of the shredder and that person was Ford. Upon receiving the "joke shock" text message from Ortiz about shredding, she decided to use it. At that moment Ford was facing possible termination from her employment because of long-standing poor evaluations from Spirito. Her ratings on numerous categories across the board in her latest

evaluation were "unacceptable" and "needs improvement." This had precipitously dropped from her earlier evaluations, which were also poor. For several weeks she had been going behind Spirito's back to speak with his enemy on the PAC Board, Mallon. She also believed, according to her testimony in this case, that she thought that the Board meeting that afternoon was to consider her employment or Spirito's employment. She testified that her perception before the scheduled afternoon Board meeting was that it was either herself or Spirito at risk.

In considering Ford's motivation to communicate her complaints as well as the text message about shredding specifically to Mallon, it is important to bear in mind the depths of the hostility and bitterness the restaurant controversy involving McDermott engendered. In his deposition Thomas volunteered the fact that McDermott pestered him repeatedly in the airport restaurant, discussing rumors he was spreading "so we can get Ken." McDermott also said to him "Ken got it coming." (Thomas Depo. 47:1-23) McDermott was a person that was enraged and pursuing a deep-seated vendetta against Spirito. Mallon had been McDermott's friend since the 1980s, had worked with McDermott, had attended parties with him at his home over the years. They were so close that  Mallon actually agreed to testify in court on McDermott's behalf, against the PAC *while he was a sitting PAC Commissioner.*

When Ford contacted Mallon on March 2nd to tell him about Ortiz's text message about shredding, Mallon further encouraged use and dissemination of the allegation by directing Ford to call another Board member, Rob Coleman. That Board member then took the likewise bizarre and inexplicable action of calling the state police to report the shredding. No one at the PAC or any of the Board members (other than Aubrey Fitzgerald, who has passed away since the events in question) had the sense or good faith to say that the allegations should have been looked into

in some manner before notifying the state police of a potential crime. These actions are not explainable on any basis other than an unspoken effort to shift blame for the events going on at the time onto Spirito. Under the circumstances described above, the use and publication of these text messages was absolutely reckless and was done with substantial certainty that any allegation of shredding of evidence was false. These circumstances and others in this case can easily lead the finder of fact to make a finding of actual malice and common-law malice on the part of the agents and employees of the PAC.

It is telling that, even after determining that Plaintiff's actions were so egregious that the police should be involved, there was no move by the Board to institute a document retention policy or a no-shredding policy. No one sent out an email or memo to Spirito, Ford or to any other PAC employees addressing the propriety of the use of the shredder during the audit. Nothing was done in terms of clarifying any document retention policy. No attorney was consulted. No one suggested that using the shredder during the audit was a problem. No one was asked to look into the circumstances of the report initiated by Ortiz. There is no evidence at all that any such measure was taken, and the PAC employees uniformly testified that there was never any change in shredding or document retention policies even after March 2 while the audit continued through May.

The only action that Mallon and the other PAC Board members decided to take in response to this absurd report was to initiate a criminal investigation of Spirito. It is obvious that the Board members were looking for a scapegoat regarding the entire People Express loan situation, and the whispering campaign had established Spirito as the target. The fact that they took no action whatsoever in response to this message about shredding documents other than to report Spirito to the police indicates clearly that the Board had no interest in the "integrity of the audit" they simply wanted to blame Spirito. After March

2 the efforts of the VDOT auditors skewed toward Spirito as the target which had not been the case before. Ford subsequently provided to VDOT essentially the same complaints that she had made to Mallon earlier in 2017, and these ultimately found their way into Spirito's termination letter. The totality of the evidence establishes a malicious effort to blame Spirito for everything he could be blamed for and to further publish a criminal allegation of the destruction of evidence.

Ford is also testified that when she was asked in her interview by the VDOT auditors a general question about whether she was aware of any shredding at the office, she provided the text message originated by Ortiz. She did not provide any other information. She did not report that she herself had been shredding documents during the audit as she has acknowledged. She did not report that other PAC office employees had been using the shredder during the audit. This simply cannot be viewed as an honest response to the question about shredding and it was not a good faith response. Ford's actions in this regard were the direct and proximate cause of the publication of the text messages originating from Ortiz in the auditor's report and the ultimate publication of the text messages in the newspaper. Although Ford attempts to claim at this time that she "reluctantly" provided the text messages, the testimony of Ortiz shows that claim to be false. Ortiz stated that Ford had approached her before her interview asking if she could provide Ortiz's text message to the VDOT auditors. When Ortiz was asked directly who thought it necessary to tell VDOT about the shredding allegation, she responded "it was Renée." [Ortiz P 42:14-17]

The law on the issue of actual malice has been briefed to this court in detail at the Motion to dismiss stage. In its opinion, the court has found that the allegations set forth

in the Complaint, if proved, could substantiate a claim of defamation and could meet the standard of actual malice. As noted above, the facts produced in discovery to date have corroborated Plaintiff's claims as set forth in the Complaint on every key point. This is testimony based largely on the PAC's *own* witnesses and employees. Plaintiff has stated sufficient facts based on references to the record to support a finding of all of the elements of the claim of defamation against a public figure including the actual malice standard. The PAC is liable for any actions of its employees or agents conducted within the scope of their employment and/or agency of the PAC and this is not disputed with respect to all of the essential facts.

The law on actual malice is summarized in the United States Supreme Court's opinion in <u>St. Amant v. Thompson</u>,

> The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the Defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports. <u>St. Amant v. Thompson</u>, 390 U.S. 727, 732 (1968)

Evidence in the record as outlined herein establishes that the publications of allegations about shredding were not made in good faith, were inherently improbable and, manifestly, that there were "obvious reasons to doubt the veracity" of the implication of shredding evidence. <u>St. Amant</u> further holds that:

> There must be sufficient evidence to permit the conclusion that the Defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice. <u>St. Amant</u>, at 731.

 In any defamation by implication case, there is the literal statement and the implied statement. The literal statement at issue in this case was that  Spirito was shredding documents. The implied proposition was that  Spirito was shredding evidentiary documents to hide information from government auditors. As in every other jurisdiction in the United States, Virginia recognizes this form of defamation and its recent opinions emphasize that the court views this form of defamation as a viable cause of action that must be recognized when the elements are met. See. E.g. Webb v. Virginian-Pilot Media Cos., 287 Va. 84, 752 S.E.2d 808 (2014); Pendleton v. Newsome, 290 Va. 162, 172, 772 S.E.2d 759 (2015); Carwile v. Richmond Newspapers, Inc., 196 Va. 1, 8, 82 S.E.2d 588, 592 (1954).  These issues were adjudicated at the Motion to dismiss stage in this matter and the court has found that Defendant's agents and actors would not have commented on the innocent conduct of shredding but for their desire to imply that it was improper. The court has found as a matter of law that the statements at issue regarding shredding can sustain the defamatory implication Plaintiff alleges. Spirito v. Peninsula Airport Comm'n, 2018 U.S. Dist. LEXIS 198939, *22 (November 21, 2018).

Throughout the litigation of this case and again in the memorandum in support of this Motion for Summary Judgment, Defendant has stated that it had no knowledge of what documents were shredded. As they attempted to argue at the Motion to Dismiss stage, Defendant argues to the court that since they had no knowledge of what was shredded, they cannot be held accountable for the implied defamatory statement that Plaintiff was shredding evidentiary documents in order to hide them. Therefore, they argue, they cannot be found to have entertained serious doubts about the truth of their statements and therefore cannot be found to have possessed New York Times actual

malice. But this is logically backward. Each time the Defendant states that they have no knowledge at all of what was shredded, they affirm that they in fact entertained serious doubts about the implied proposition — the proposition that Plaintiff was shredding evidentiary documents in order to hide them from government auditors. The fact that they had no knowledge whatsoever of what was shredded confirms that were substantially uncertain about what was shredded — they entertained serious doubts about the proposition that evidentiary documents were being shredded for an improper purpose.

The illogic of Defendant's argument becomes very clear if it is applied to a scenario of literal defamation as opposed to defamation by implication. If Defendant had literally said "Ken Spirito was shredding evidentiary documents in order to hide them from government auditors" they could not claim immunity from responsibility for this statement on the ground that they had no knowledge whatsoever of what Spirito had shredded. The fallacy would be obvious. It is equally illogical for Defendant to make this argument in this case, when the implied proposition of the statements at issue is that Spirito was shredding evidentiary documents to hide information from government auditors.

## PRIVILEGE

Defendant argument based on privilege relating to submitting the text messages to VDOT need not be dealt with at length because it is the same analysis as the actual malice analysis. If this court finds that the privilege applies, the question of whether the privilege was abused is a jury issue. The model jury instruction provides that the privilege is abused if:

> The Defendant knew the statement was false or made it so recklessly as to amount to a willful disregard for the truth, that is, with a high degree of

awareness that the statement was probably false; or The statement was made because of personal spite, hatred, ill will, or desire to hurt the Plaintiff, independent of the occasion on which the communication was made.

As argued above, the facts developed in this case to date based largely on testimony of the PAC's own employees can support such a finding. On this basis, Defendant's argument of privilege must also fail as a basis for Summary Judgement.

## THE PAC CAN BE RESPONSIBLE FOR THE ACTIONS OF WILMER THOMAS

Defendant's remaining argument relates to the second string of text messages originating from Thomas. These text messages were also published on the front page of the daily press juxtaposed over images of evidentiary documents relating to the audit. Based on Thomas's deposition testimony as outlined below, it is evident that his claims are absolutely lacking in any credibility. Nevertheless, the actions of other PAC employees led to the ultimate publication of these text messages, and the PAC is responsible for these actions.

Wilmer Thomas was a custodian at the PAC for several years. He was terminated on February 24, 2017 by Melissa Cheaney because of inappropriate communications with customers and other employees. Cheaney testified unequivocally that when she terminated Thomas, it was for those reasons and that she had no knowledge whatsoever at that time of any allegation of shredding originating from Thomas. (Cheaney Dep )

More than a month after his termination, on March 17th, Thomas wrote the following Facebook message to Scott, *"I know about the paper shredding at the airport!"* On April 12, 2017 Thomas sent another Facebook message to Scott:

*"I told you I know about that I know about the paper shedding a couple of weeks ago. I saw Jessica and Ken coming from the shredder when I walked in the office after 8pm. Then I was let go about two weeks later… "*

At the time of her interview with VDOT auditors in April, Scott provided this Facebook message to the VDOT auditors. (Scott Dep. 20:18-21) The auditors placed it in their report and the Daily Press published it on the front page of the newspaper, juxtaposed over pictures of evidentiary documents related to the audit.

Thomas gave peculiar testimony regarding the events that led to his text message about shredding. He agreed that at the time of the alleged shredding, he never reported the incident to anyone. (Thomas Dep. 30:1-5) He seems to believe that the shredding occurred on January 27, a date when Spirito and Wharton were present at the office late that afternoon/evening. According to the testimony of Spirito and Wharton, they had a lengthy telephone conference with Dave Ress of the Daily Press that evening. (Wharton Dep. 34:5-21)

Thomas was upset about the fact that he was terminated on February 14. He did not understand the reasoning and did not agree with the decision.  He spent a lot of time at home thinking about what had happened and asking himself why he had been terminated. He sat at home and "beat myself in the head" thinking about it. At some point he decided that he had been terminated because of something he had observed a month earlier, the January 27 incident when he said that he saw Wharton and Spirito walking around a corner where the shredder was. He could not see the shredder. He agreed that he did not know who shredded something but he heard the shredder. [Thomas Dep. 26:18-19] He did not think about this incident again until more than a month later as he was sitting in his home trying to figure out why he was terminated. He agreed that he never said anything to anyone about shredding until March 17 when he decided that he had been terminated because he observed some shredding (which he did not actually observe, by

his own testimony). When he had the "aha moment," as he was sitting at home a month later, he sent the message to Scott "*I know about the shredding at the airport!*"

It is important to note that the message speaks not of "shredding" but of "the shredding." Thomas was obviously referring to something that was already known. In other words, he knew about the shredding allegations arising from the March 2 comments made by Ortiz and Ford and he was surmising that his termination must've been somehow related to it. Thomas also appeared to believe that Scott likewise was familiar with the shredding allegation when he sent the message. Thomas's testimony about his alleged observation of shredding is utterly lacking in credibility.

What is important is that this is simply one consequence of the allegations about the shredding of documents by plaintiff that were set in Motion on March 2 by Ortiz and Ford. Scott is responsible for republishing to the VDOT auditors the messages sent to her by Thomas, which themselves resulted from the allegations originating from Ford and Ortiz. It was because of the false allegations regarding shredding of evidentiary documents originating from Ortiz and Ford on March 2nd that Thomas got the idea to claim that his termination was in some way related to his recollection that he observed someone using the shredder several weeks earlier. Thomas attempted to connect an alleged observation of shredding documents with his termination due to the allegations set in Motion by Ortiz and Ford. Had Ortiz's and Ford's allegations not been circulating to others at the PAC such as Thomas at that time, Thomas would have had no reason to make any such connection.  It was this baseless inference that prompted Thomas to send his Facebook message about shredding to Scott. Again, the actions of Scott, Ford and

Ortiz within the scope of their employment and/or agency of the PAC and the PAC can be held vicariously liable for these actions.

<u>CONCLUSION</u>

For the foregoing reasons, defendant has not set forth facts sufficient to support a finding that there are no material disputed issues of fact in this case. Accordingly, Defendant's Motion for Summary judgment should be denied.

Respectfully submitted,

KEN SPIRITO,

/s/ David L. Littel_____

Of Counsel

David L. Littel, Esq. VSB# 37690
Kellam T. Parks, Esq. VSB# 45735
Meghan M. Casey, Esq. VSB# 86771
**Parks Zeigler, PLLC**
4768 Euclid Road, Suite 103
Virginia Beach, Virginia 23462
(757) 453-7744 (phone)
(757) 453-7578 (fax)
dlittel@pzlaw.com
kparks@pzlaw.com
mcasey@pzlaw.com
Counsel for Plaintiff, Ken Spirito.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 7, 2019, I emailed the foregoing to counsel of record:

Conrad M. Shumadine, Esq. (cshumadine@wilsav.com)
Counsel for PAC, et al.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia  23510

/s/ David L. Littel _____