IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

KEN SPIRITO,

    Plaintiff,

v.                                                  Civil Action No. 4:18cv58

PENINSULA AIRPORT COMMISSION,

    Defendants.

## ORDER

This matter is before the Court on Peninsula Airport Commission's (the "PAC's" or the "Commission's") Motion for Summary Judgment ("Motion"), Doc. 63. On Wednesday, March 26, 2019, the parties convened for a hearing to argue the Motion. For the reasons stated herein, the Court **GRANTS** Defendant's Motion for Summary Judgment, **IN PART**.

### I.    PROCEDURAL HISTORY

On January 17, 2018, Plaintiff Ken Spirito ("Plaintiff" or "Spirito") filed a defamation action in state court against the PAC, Lisa Ortiz, Renee Ford, Wilmer Thomas, and Sharon Scott (collectively, "PAC Defendants") based on the same facts at issue in this case. See Ken Spirito v. Peninsula Airport Commission Newport News/Williamsburg International Airport, Lisa M. Ortiz, E. Renee Ford, Wilmer K. Thomas, Jr. and Sharon P. Scott, Case No. CL 18-103; Doc. 9 at 1. After a hearing on April 13, 2018, the state court sustained the PAC Defendants' demurrer and gave Plaintiff leave to amend his Complaint. Doc. 14-1 at 88-89. On April 27, 2018, the state court entered a Nonsuit Order, Doc. 9-1 at 280, and on May 23, 2018, Plaintiff filed the present action against the PAC Defendants and the The Daily Press, Inc. ("Daily Press"). Doc. 1.

On June 19, 2018, the PAC Defendants filed their Motions to Dismiss for Failure to State

a Claim and joint Memorandum in Support. Docs. 3-8. On the same day, the PAC Defendants filed a Motion for the Court to Take Judicial Notice of Plaintiff's lawsuit in the Circuit Court of Williamsburg/James City County, and a Motion to Sever their claims from those brought against the Daily Press, Doc. 11. On July 3, 2018, the PAC Defendants filed another Motion for the Court to Take Judicial Notice of the April 13, 2018, Demurrer Hearing before the Circuit Court of Williamsburg/James City County. Doc. 14. Plaintiff filed his Opposition to these Motions on July 3, 2018. Doc. 16.

On August 10, 2018, the Daily Press filed a Motion to Dismiss, Doc. 23, and a Motion to Sever its claims from those brought against the PAC Defendants, Doc. 25. Plaintiff filed his Opposition to these Motions on August 24, 2018, Docs. 31-32, and the Daily Press filed its Replies on August 30, 2018, Docs. 33-34.

In an Order dated November 21, 2018, the Court: GRANTED the PAC Defendants' Motions for Judicial Notice, Docs. 9, 14, IN PART; DENIED the PAC Defendants' Motions to Dismiss, Docs. 3-7; RESERVED RULING on the issue of respondeat superior as it pertains to Defendant Thomas; GRANTED the Daily Press' Motion to Dismiss, Doc. 23; and DENIED Defendants' Motions to Sever, Docs. 11, 25, AS MOOT. Doc. 38. The Daily Press was thus dismissed as a defendant. The remaining Defendants filed their Answers to the Complaint on December 5, 2018. Docs. 42-46.

On December 3, 2018, the Daily Press filed a Motion to Quash Plaintiff's Notice to Take the Discovery Deposition of Daily Press Reporter Peter Dujardin. Doc. 41. The Court GRANTED this Motion on January 3, 2019. Doc. 46. The Court granted an Agreed Protective Order on January 22, 2019.

On January 23, 2019, Plaintiff filed a Motion to Compel. Doc. 51. The Motion was fully

briefed on February 12, 2019. Docs. 54-55. The Court held a hearing and GRANTED the Motion, IN PART, on March 7, 2019. Doc. 70.

Defendants filed the instant Motions for Summary Judgment on February 21, 2019. Docs. 59, 61, 63, 65. Plaintiff filed a single Opposition on March 7, 2019. Doc. 69. Defendants filed a single Reply on March 13, 2019. Doc. 71. On March 19, 2019, the Court GRANTED Plaintiff's Motion to Supplement his Opposition to Defendants' Motions for Summary Judgment. Doc. 76. The Court entered a Consent Order DISMISSING Defendants Ford, Ortiz, Thomas, and Scott from the case on the same day. Doc. 75. Accordingly, the only Motion for Summary Judgment at issue is that of the Peninsula Airport Commission. Doc. 63.

On March 20, 2019, Plaintiff moved to Reopen Depositions of Renee Ford, Steve Mallon, and Rob Coleman. Doc. 77. The motion was unopposed. Doc. 79. The Court GRANTED the Motion on March 21, 2019. Doc. 80.

## II. FACTS

This case concerns statements made or repeated by current and former PAC employees Lisa Ortiz, Renee Ford, Wilmer Thomas, and Commission member Sharon Scott. The statements comment on Spirito's conduct in shredding documents during a government investigation of the PAC. At the time in question, Spirito was Executive Director of the PAC. Spirito Dep. 34:9-11. The statements were published in a public audit report and later in the Daily Press.

a. **Undisputed Facts**[1]

i. *VDOT Investigation*

In 2017, the Virginia Department of Transportation ("VDOT") investigated a $5 million

---

[1] This section combines facts agreed by the parties and facts supported by uncontroverted evidence in the record. Claims asserted by either party without citation to the record are excluded.

3

commercial loan default involving People Express Airlines, Inc., that was guaranteed by the PAC. Doc. 69 at 3-4; Doc. 24 at Ex. 1 ("VDOT Report"). The investigation began on January 27, 2017, and continued through May 2017. Id.

On February 28, 2017, the Daily Press published an article stating that Spirito was asked to leave the room at a February 27, 2017, PAC special meeting. Doc. 69 at 13-14. It further reported:

> The audit is likely to take longer than expected because the Commission is not providing documents investigators have requested, in some cases two or three times, and because Commission staff have not made themselves available, said Secretary of Transportation Aubrey Layne.[2]

Id. Plaintiff testified that the Daily Press published several other articles depicting the PAC as uncooperative with the investigation. Spirito Dep. 40:10-12. He stated that "it was plain" the VDOT auditors were claiming some documents had not been produced by the PAC, and that "everyone" in the office was aware of that criticism. Id. at 42:11-19. According to Spirito, by March 2, 2017, Renee Ford was "plainly aware" that there had been complaints from Secretary Layne that the Commission was not being forthcoming with documents. Id. at 57:14-18.

On February 28, 2017, PAC Commissioner Rob Coleman sent an email to Spirito and Bert Kelly, counsel for the PAC, emphasizing that all documents requested by the VDOT auditors were "to be delivered ASAP." Doc. 64 at Ex. C.

*ii. Shredding Incident*

On March 2, 2017, there was a special meeting of the PAC Board. Doc. 64 at Ex. A. The email announcing the meeting to relevant parties, including Spirito, stated the purpose of the meeting was "to discuss issues related to the audit currently being conducted by the Commonwealth, issues

---

[2] Plaintiff concedes that the Daily Press published such an article, but he argues that it is inadmissible hearsay. The Court has included the article not for its truth, but for its potential effect on the PAC employee environment on the date of the incident in question.

4

related to personnel, and legal representation." Id. Ford testified that she and Spirito were the individuals "basically providing information to the [VDOT] auditors." Ford Dep. 38:3-11. She thus concluded that the special meeting might be to discuss a personnel action against her or Spirito. Id. at 38:25-39:6.

Before the meeting, at approximately 8:15 to 8:30 a.m., Spirito shredded documents at the central office shredder. Spirito Dep. 13:1-3, 34:13-15, 37:13-19, 39:17- 40:3, 74:10-13; Ortiz Dep. 25:15-25, 27:5-16; Wissinger Dep. 23:3-5, 23:25-25:7. Ortiz walked up to the shredder to make a copy while Spirito was shredding. Ortiz Dep. 27:8- 28:1. She did not recall if Spirito stopped shredding when she walked up to the shredder, and she did not see what he was shredding. Id.

Spirito's administrative assistant at the time was Rhonda Wissinger. Wissinger Dep. 8:10-18. Wissinger testified that Spirito routinely shredded documents during his time as Executive Director. Wissinger Dep. 16:21-17:3. Ortiz testified that Spirito typically used the shredder once or twice a year. Ortiz 14:17-15:10. Ford testified that Spirito used the shredder, but "not very much." Ford Dep. 44:1-10. She stated that when she observed Spirito shredding at any one time, it was for documents of seventeen (17) pages or less. Id. 44:7-18. All three employees testified that they continued to use the shredder themselves during the audit, and that other office employees did so as well. Wissinger Dep. 20:17-22; Ortiz Dep. 13:19-14:23; Ford Dep. 49:8-15, 50:15-21. They also testified that there was no change in office policy regarding shredding or document retention during the audit. Wissinger Depo. 18:13-20:16; Ortiz Dep. 20:5-12; Ford Dep. 48:21-49:4.

At the March 2 meeting, the Board voted to place Spirito on administrative leave. Wissinger Dep. 29:4-11; Ford Dep. 94:12-15.

*iii. Alleged Defamation*

On March 2, 2017, the day of the alleged shredding incident, Ortiz initiated the following

5

text messages to her supervisor, Ford:

> Ortiz: *"Wow Ken is shredding shredding shredding."*
> Ford: *"Unbelievable"*
> Ortiz: *"Seems kinda weird"*
> Ford: *"This is getting out of hand!"*

Ortiz Dep. 22:24-23:10. Ford was not in the office at the time she received the messages from Ortiz. Doc. 69 at 15. Neither Ford nor Ortiz knew what Spirito was shredding. Ford Dep. 71:12-17; Ortiz Dep. 27:5- 28:1. Later that day, Ford called PAC Board member Steve Mallon to inform him what she had heard from Ortiz about Spirito's shredding. Ford Dep. 56:13-57:10. Mallon told Ford to contact PAC Board member Rob Coleman. Id. Coleman called the state police to report the shredding. Coleman Dep. 17:8-28:8.

The second allegedly defamatory statement was initiated by Wilmer Thomas. Thomas was a custodian at the airport for several years. Thomas Dep. 12:8-13:16. He was terminated from this position in February of 2017. Id. 29:14-20; see also Spirito Dep. 11:20-12:2. On March 17, 2017, Thomas sent Commissioner Sharon Scott a Facebook Message that said: *"I know about the paper shredding at the airport."* Scott Dep. 17:15-21; Thomas Dep. 19:12-20:24. On April 12, 2017, Thomas sent the following message to Commissioner Scott:

> *I told you about I [k]now about the paper shredding a couple of weeks ago. I saw Jessica and Ken coming from the shredder when I walked into the office after 8 p.m. Then was let go about 2 weeks later…*

Scott Dep. 20:9-15; Thomas Dep. 19:12-23. Scott transmitted these messages to the VDOT auditors. Scott Dep. 32:13-25. The messages from Thomas and Ortiz were published in the VDOT Report and eventually the Daily Press. See VDOT Report at 44; Doc. 24 at Ex. 3.

*iv. Relationship between Spirito and Ford*

In Ford's employee performance evaluation for the period of January 2016 to July 2016, she received mostly ratings of "1" and "2" on a 5-point scale. Doc. 69 at Ex. 2. Spirito

6

administered the review. Ford Dep. 23:7-22. In January 2017, Ford approached Commissioner Mallon at a PAC retreat. Ford Dep. 16:8-15. She voiced numerous complaints about Spirito, including her negative review and her perception that Spirito created "an oppressive environment" at the PAC. Id. 17:2-22:19.

**B.  Disputed Facts**

As relevant to this Motion, the main dispute of fact is whether Spirito's shredding on March 2 was noteworthy or suspicious. Wissinger testified that there was nothing out of the ordinary about Spirito's shredding on the morning in question. Wissinger Dep. 25:11-24. Besides Ortiz and Ford, two other employees who heard the shredding that morning testified that the shredding took an unusually long time. See Deposition of Rowena Byrd 23:25-24:23 ("When it was noted that he was shredding, I remember the morning because I heard the shredder going, going, going, and I just thought that was unusual because it was going so long."); Deposition of Jessica Minor 20:9-17 ("I heard the shredder going and it was going for, I want to say it was going long enough where I thought to myself who is that shredding.").

### III.  LEGAL STANDARD

Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–50 (1986); Groves v. Comm'n Workers of Am., 815 F.3d 177, 180 (4th Cir. 2016). Once a party has properly filed evidence supporting the motion for summary judgment, the nonmoving party may not rest upon mere allegations in the pleadings but must instead set forth specific facts illustrating genuine issues for trial. Celotex, 477 U.S. at 322–

24. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

A mere scintilla of evidence is insufficient to withstand a motion for summary judgment. Rather, the evidence must be such that the factfinder could reasonably find for the nonmoving party. See Anderson, 477 U.S. at 252. Although the court must draw all justifiable inferences in favor of the nonmoving party, to successfully defeat a motion for summary judgment, a nonmoving party cannot rely on "mere belief or conjecture, or the allegations and denials contained in his pleadings." Doyle v. Sentry Ins., 877 F. Supp. 1002, 1005 (E.D. Va. 1995) (citing Celotex, 477 U.S. at 324).

## IV. ANALYSIS

At issue are the allegedly defamatory statements[3] of Lisa Ortiz, Renee Ford, Sharon Scott, and Wilmer Thomas. The PAC concedes that if the statements of these individuals were made in the scope of their employment, and the statements violated the law, it will be liable for such statements. Doc. 64 at 1. If the Court finds that an employee's statement may not sustain a claim for defamation, the PAC is necessarily absolved from liability for that statement. See Roughton Pontiac Corp. v. Alston, 372 S.E.2d 147, 149 (Va. 1988) ("It is well settled in Virginia that where master and servant are sued together in tort, and the master's liability, if any, is solely dependent on the servant's conduct, a verdict for the servant necessarily exonerates the master.").

### A. Statements of Wilmer Thomas

The PAC first moves for summary judgment for the statements of Wilmer Thomas. It argues that it cannot be liable for Thomas' statements because Thomas was not a PAC employee

---

[3] This includes republications.

8

at the time of their publication. In Virginia, "an employer is liable for the tortious acts of its employee if the employee was performing his employer's business and acting within the scope of his employment when the tortious acts were committed." Lacasse v. Didlake, Inc., 194 F. Supp. 3d 494, 501 (E.D. Va. 2016), aff'd, 712 F. App'x 231 (4th Cir. 2018) (quoting Plummer v. Ctr. Psychiatrists, Ltd., 476 S.E.2d 172, 173 (Va. 1996)). Here, it is undisputed that Thomas was terminated in February 2017. See Doc. 69 at 26; Thomas Dep. 27:17-28:21; Spirito Dep. 11:20-12:2. In fact, Plaintiff admits that Thomas "never mentioned anything to anyone about shredding until approximately five weeks later when he was sitting at home and decided that his termination must've had something to do with shredding." Doc. 69 at 11. Plaintiff does not attempt to argue that Thomas' statements to Sharon Scott were made in the scope of his employment. Nor does Plaintiff assert an independent tort by the PAC with respect to these statements. Accordingly, the Court **GRANTS** summary judgment for the statements of Wilmer Thomas to Sharon Scott.[4]

### B. Actual Malice

To state a claim for defamation in Virginia, a Plaintiff must allege: (1) publication of (2) an actionable statement with (3) the requisite intent. Schaecher v. Bouffault, 772 S.E.2d 589, 594 (Va. 2015) (citing Tharpe v. Saunders, 737 S.E.2d 890, 892 (Va. 2013)). This Court has already determined that the statements published by Scott, Ortiz, and Ford (collectively, the "publishers") are actionable.[5] See Spirito v. Peninsula Airport Comm'n, 350 F. Supp. 3d 471, 484 (E.D. Va. 2018). To survive summary judgment, Plaintiff must therefore prove that the statements were made with the requisite intent.

---

[4] Applying Virginia law, this does not necessarily excuse Scott for republishing Thomas' statements to the VDOT auditors. See WJLA-TV v. Levin, 564 S.E.2d 383, 390 (Va. 2002) ("[I]t is true . . . that each publication of a defamatory statement is a separate tort and, indeed, generally subsequent republications of such a statement are separate torts . . . .") (citing Weaver v. Beneficial Finance Co., 98 S.E.2d 687, 690 (Va. 1957)).

[5] "To be actionable, the statement must be both false and defamatory." Tharpe v. Saunders, 737 S.E.2d 890, 892 (Va. 2013). On the PAC's Motion to Dismiss, this Court held that the implication of the statements at issue could satisfy this standard.

9

i.   *Applicable Law*

Where, as here, an action is brought by a limited-purpose public figure, the "requisite intent" established by the Supreme Court is "actual malice" – knowledge that a statement was false or with reckless disregard for whether it was false or not. New York Times Co. v. Sullivan, 376 U.S. 254, 279-80 (1964). "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731 (1968); see also Carr v. Forbes, 259 F.3d 273, 282 (4th Cir. 2001) ("Reckless disregard means publishing with a high degree of awareness of probable falsity.") (internal quotations and alterations omitted). Because actual malice is a subjective inquiry, a plaintiff "is entitled to prove the defendant's state of mind through circumstantial evidence." Harte-Hanks Commc'ns, Inv. v. Connaughton, 491 U.S. 657, 668 (1989). Summary judgment is not appropriate if a reasonable jury, construing the facts in the light most favorable to the nonmoving party, could find actual malice by clear and convincing evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255-56 (1986).

ii.   *Analysis*

This case concerns defamation by implication. Accordingly, Plaintiff need not show that the literal statements of the publishers were false. Rather, he must show that the publishers implied his shredding was illegal or improper while entertaining serious doubts about the truth of that implication. In other words, Plaintiff must show that Ford, Ortiz, and Scott published their statements knowing that Spirito's shredding was likely innocent. St. Amant, 390 U.S. at 731. The Court **FINDS** that there is a genuine dispute of material fact as to Plaintiff's burden.

Plaintiff has proffered sufficient evidence of actual malice by Renee Ford and Lisa Ortiz

to defeat Defendant's Motion. Wissinger, Ford, and Ortiz all testified that Spirito had used the shredder on several occasions before and during the VDOT audit without incident. Wissinger Dep. 16:21-17:3; Ortiz 14:17-15:10; Ford Dep. 44:1-10. Ford and Ortiz admitted that they and other PAC employees used the shredder regularly during the audit. Ortiz Dep. 13:19-14:23; Ford Dep. 49:8-15, 50:15-21. Moreover, there was no formal document hold during the audit, despite the negative press the Commission was receiving at the time. Wissinger Depo. 18:13-20:16; Ortiz Dep. 20:5-12; Ford Dep. 48:21-49:4. These facts show that Spirito's use of the shredder may have been an ordinary office occurrence. This inference is bolstered by Wissinger's testimony that there was nothing unusual about Spirito's use of the shredder on March 2. Taken together, Plaintiff has presented a genuine dispute of material fact as to whether Ford and Ortiz published their statements with reckless disregard for whether Spirito's conduct was improper.

Defendant presents facts that could support an alternative inference. For example, there was a meeting later that day concerning compliance with the VDOT audit and "personnel" issues. Doc. 64 at Ex. A. Spirito was one of the main PAC employees providing information to VDOT auditors. Ford Dep. 38:3-11. Therefore, one could infer that his employment was at issue. Several employees thought Spirito's shredding took an unusually long time. Byrd Dep. 23:25-24:23; Minor Dep. 20:9-17. Moreover, Spirito admits that all the PAC employees were aware of the Daily Press article criticizing the PAC for failing to cooperate with the audit. Spirito Dep. 42:11-19. This environment may have placed Spirito under close observation by his coworkers. Nevertheless, it is not this Court's job to weigh competing inferences on summary judgment, but to resolve all such inferences in favor of the nonmoving party. Where "possibly subjective evaluations are at issue, as here where a determination of whether Defendants acted with actual malice . . . the Fourth Circuit has cautioned against a Court taking those determinations away from

11

a jury." Nat'l Life Ins. Co. v. Phillips Pub., Inc., 793 F. Supp. 627, 632 (D. Md. 1992) (citing Herold v. Hajoca Corp., 864 F.2d 317, 319 (4th Cir.1988)).

Sharon Scott's actions following the receipt of Thomas' message also support an inference that she acted with actual malice. When Thomas sent the Facebook messages to Scott, he had not been employed by the PAC for approximately five weeks. See Doc. 69 at 26; Thomas Dep. 27:17-28:21; Spirito Dep. 11:20-12:2. He was allegedly terminated for misconduct while speaking to airline personnel. Thomas Dep. 17:20-9. Accordingly, his position as a reliable source of information has been compromised. Scott's doubt about the truth of his assertions is supported by her claim that she did not "do anything" with the message until her interview with a VDOT auditor. Scott Dep. 20:18-21. By the time she received Thomas' message, Scott was aware of the auditors' complaints about not receiving documents. Scott Dep. 14:5-9. Nevertheless, she did not share Thomas' messages with her fellow commissioners or follow up with Thomas in any form. Id. A lack of investigation prior to publishing does not, in itself, prove actual malice. St. Amant, 390 U.S. at 731. However, the fact that Scott did not take any action in response to Thomas' allegations is probative of the significance she afforded the message.

The circumstances surrounding the audit further support the existence of a genuine dispute of material fact as to an inference that Scott published Thomas' message with actual malice. The numerous critical Daily Press articles and the alleged purpose of the March 2 PAC meeting, Doc. 64 at Ex. C, suggest that the Commission was under pressure to assure compliance with the VDOT audit. Accordingly, Scott, as a Commission member, had motive to shift the blame for noncompliance to Spirito, even if she had serious doubts about the veracity of Thomas' message. Moreover, the PAC commissioners knew or should have known whether Spirito possessed any unique and material information missing from the audit. The PAC has failed to identify any such

documents. Scott therefore had no reason to believe that Spirito shredded material information. Accordingly, the Court cannot say as a matter of law that Defendant is entitled to summary judgment on this issue.

**B.     Common Interest Privilege**

The PAC next argues that, even if Plaintiff demonstrates actual malice, the statements of Scott, Ford, and Ortiz are protected by Virginia's "common interest privilege." Doc. 58 at 5.

*i.     Applicable Law*

In Virginia, "a qualified privilege may attach to certain communications, providing the defendant with a defense to a claim of defamation." Adler v. Va. Commonwealth Univ., 259 F. Supp. 3d 395, 409 (E.D. Va. 2017) (citing Cashion v. Smith, 749 S.E.2d 526, 532 (Va. 2013)). One such privilege "attaches to communications between persons on a subject in which the persons have an interest or duty." Cashion, 749 S.E.2d at 532 (internal quotations omitted). This privilege "applies broadly to all statements related to 'employment matters,' provided the parties to the communication have a duty or interest in the subject matter." Taylor v. CNA Corp., 782 F. Supp. 2d 182, 202 (E.D. Va. 2010) (quoting Larimore v. Blaylock, 528 S.E.2d 119, 122 (Va. 2000)).

A plaintiff may defeat the common interest privilege by showing that a defendant acted with "common law malice." Cashion, 749 S.E.2d at 532 (citing Government Micro Res., Inc. v. Jackson, 624 S.E.2d 63, 71 (2006)). This must be proven by clear and convincing evidence. Id. In Virginia, common law malice is a broader concept than actual malice, but the former encompasses the latter. See Great Coastal Exp., Inc. v. Ellington, 334 S.E.2d 846, 851 n.3 (Va. 1985) (observing actual malice "focuses only upon knowledge of falsity," while "[c]ommon law malice includes that element, but also includes matters related to the speaker's motive and mental state."); see also, Cashion, 749 S.E.2d at 533. Accordingly, if a plaintiff shows actual malice by

13

clear and convincing evidence, he has also proven common law malice. See Government Micro Resources, Inc. v. Jackson, 624 S.E.2d 63, 71 (Va. 2006) ("[E]ven if the alleged defamation was entitled to a qualified privilege, the privilege would have been lost if the jury found [the defendant] uttered the statements with actual malice."); Raytheon Tech. Servs. Co. v. Hyland, 641 S.E.2d 84, 89-90 (Va. 2007) (finding the evidence sufficient to overcome a qualified privilege when the plaintiff has proven actual malice). A plaintiff may also prove common law malice by showing statements "were motivated by personal spite or ill will," or "were not made in good faith." Cashion, 749 S.E.2d at 533. Any one of these elements, if pled and proved, will suffice to defeat the common interest privilege. Id.

Whether a privilege attaches to a statement is a question of law, and whether a defendant has lost or abused a qualified privilege is a question of fact for the jury. Dragulescu v. Virginia Union Univ., 223 F. Supp. 3d 499, 508 (E.D. Va. 2016) (citing Cashion, 749 S.E.2d at 526).

*ii. Analysis*

Plaintiff does not dispute that the qualified privilege applies to the statements of Ford and Ortiz. The Virginia Supreme Court has found that employees "have a general duty to inform management of adverse or improper actions by fellow employees, just as management has a duty to investigate and make decisions regarding matters of continued employment." Taylor v. CNA Corp., 782 F. Supp. 2d 182, 202 (E.D. Va. 2010) (quoting Larimore v. Blaylock, 528 S.E.2d 119, 122 (Va. 2000)) (internal quotations omitted). In the employment context, the common interest privilege thus "encourage[s] open communications on matters of employment while not shielding the use of such communications for an individual's personal malicious purposes." Id. Here, Ford was Ortiz' supervisor. Ortiz Dep. 45:15-19. If Ortiz in fact believed that Spirito's shredding was improper, she had an interest in informing Ford of the misconduct. See Larimore, 528 S.E.2d at

14

123. Likewise, Ford had an interest in reporting the misconduct to her superiors, the PAC commissioners. Id. To hold otherwise would chill internal reporting of employee misconduct. Accordingly, the Court **FINDS** that the common interest privilege applies to Ortiz and Ford's statements as a matter of law.

Scott's publication is also privileged. The qualified privilege applies if the speaker "has an interest, or owes a duty, legal, moral, or social in the subject matter and the listener shares that interest." Greene v. Nat'l Head Start Ass'n, Inc., No. 1:09CV546 GBL, 2010 WL 1779677, at *8 (E.D. Va. Apr. 30, 2010) (citing Taylor v. Grace, 184 S.E. 211, 213 (Va.1936)). Plaintiff does not dispute that Scott, as a PAC commissioner, had a duty to share all the information at her disposal with the VDOT auditors. Cf. Adler, 259 F. Supp. 3d 395 (finding a compliance officer was not liable for defamation under Virginia law for statements she made in audit reports because she was protected by a qualified privilege). Because Scott and the auditor had a common interest in any information potentially affecting the People Express loan, including document retention, the Court **FINDS** that the common interest privilege applies to Scott's statements.

Whether any of the publishers lost their privilege by publishing the statements with common law malice is a question for the jury. Dragulescu, 223 F. Supp. 3d at 508. Accordingly, the Court **DENIES** Defendant's Motion for Summary Judgment with respect to the statements of Ford, Ortiz, and Scott.[6]

## V. CONCLUSION

For the reasons stated herein, the Court **GRANTS** the PAC's Motion for Summary

---

[6] Plaintiff goes to great lengths to support a theory that Ford was conspiring with others at the PAC, including non-party Commissioner Mallon, to get Spirito fired. See generally Doc. 74. Ford also received poor performance reviews from Spirito and admitted to complaining about him to Commissioner Mallon. Doc. 69 at Ex. 2; Ford Dep. 17:2-22:19. Such evidence may support a finding of common law malice that would defeat Ford's qualified privilege. However, because the Court **FINDS** that Plaintiff has presented sufficient evidence of actual malice, the Court need not delve into additional evidence of common law malice at this juncture.

15

Judgment, Doc. 64, with respect to the statements of Wilmer Thomas. The Court further **DENIES** the PAC's Motion with respect to the statements of Lisa Ortiz, Renee Ford, and Sharon Scott.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

It is so **ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge
HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
April 3, 2019